**Michele LEVESQUE, et al., Plaintiffs, Appellees,**

**v.**

**John R. BLOCK, Secretary of Agriculture, et al., Defendants, Appellants.**

**Michele LEVESQUE, et al., Plaintiffs, Appellees,**

**v.**

**John R. BLOCK, Secretary of Agriculture, Defendant, Appellee.**

**Richard A. Chevrefils, et al., Defendants, Appellants.**

**Nos. 83–1341, 83–1342.**

United States Court of Appeals, First Circuit.

Argued June 7, 1983.

Decided Dec. 20, 1983.

Michael Kimmel, Atty., Appellate Staff, Civil Div., Dept. of Justice, Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., W. Stephen Thayer, III, U.S. Atty., Concord, N.H., and Leonard Schaitman, Atty., Appellate Staff, Civil Div., Dept. of Justice, Washington, D.C., were on brief, for John R. Block, Secretary of Agriculture.

Ronald B. Eskin, Manchester, N.H., for Michele Levesque, et al.

Before CAMPBELL, Chief Judge, McGOWAN,* Senior Circuit Judge, and SELYA,** District Judge.

McGOWAN, Senior Circuit Judge.

In an attempt to reduce federal spending, Congress made major changes in federal programs, including the Food Stamp Program, in the Omnibus Budget Reconciliation Act of 1981 ("OBRA"), Pub.L. No. 97–35, 95 Stat. 357 (codified in scattered sections of U.S.C.). At issue in this case are food stamp regulations that were promulgated without the notice-and-comment and thirty-day prior publication required by the Administrative Procedure Act (the "APA"), 5 U.S.C. § 553(b), (d) (1982). Because of these procedural omissions, the district court held the regulations void and mandated new rulemaking. We agree with the district court that the initial regulations are invalid, although we find that regulations promulgated the following year and now in place are legally valid. Thus we affirm the district court, with the modification that further rulemaking is not necessary.

I. Prior Proceedings

Congress established the Food Stamp Program to help improve the nutritional well-being of the needy, who otherwise would have great difficulty purchasing a sound balance of foods. It is a national program in that eligibility and benefit standards are set by federal statutes and regulations and are uniform throughout the country. See 7 U.S.C. §§ 2014, 2017 (1982). Like many other benefit programs, however, the Food Stamp Program is administered by state and local agencies that are supervised by the U.S. Department of Agriculture ("USDA"). See id. § 2020. Thus the Secretary of Agriculture (the "Secretary") is directed to "issue such regulations ... as the Secretary deems necessary or appropriate for the effective and efficient administration of the food stamp program." Id. § 2013(c). And, despite the exemption from APA procedures for grant and benefit programs, 5 U.S.C. § 553(a)(2) (1982), food stamp regulations must be promulgated "in accordance with the procedures set forth in section 553 of title 5." 7 U.S.C. § 2013(c) (1982).

Food stamps are provided on the basis of households, which are defined by reference to the purchasing and preparation of food. An individual, living alone or with others, can be considered a household if he or she typically buys and prepares his or her meals alone. Likewise, a group of related or unrelated people may be considered a household if they normally buy and prepare meals together. See id. § 2012(e) (1976); 7 C.F.R. § 273.1(a) (1980). Under these definitions it is possible for several households to share the same physical premises. Congress became concerned that this was a source of program abuse, particularly by related "households." For example, a person older than eighteen years old living with his parents but without his own income could, by buying and preparing meals separately, become eligible for the program, while he would be ineligible or eligible for lower benefits if he shared meals with his

* Of the District of Columbia Circuit, sitting by designation.

** Of the District of Rhode Island, sitting by designation.

parents. *See* S.Rep. No. 139, 97th Cong., 1st Sess. 52–53, *reprinted in* 1981 U.S.Code Cong. & Ad.News 396, 442–43; 46 Fed.Reg. 44,712, 44,718 (1981) (preamble to interim rules). In order to prevent perceived abuses of this sort, and thereby to cut program costs, the 1981 OBRA added to the definition of household the conclusive presumption that "parents and children who live together shall be treated as a group of individuals who customarily purchase and prepare meals together ... even if they do not do so, unless one of the parents is sixty years of age or older." OBRA § 101(1), 7 U.S.C. § 2012(i) (Supp. V 1981) (current version at 7 U.S.C. § 2012(i) (1982)).

This was one of several changes in the Food Stamp Program signed into law on August 13, 1981, as part of OBRA's attempt to reduce the federal budget. OBRA provided that the Food Stamp Program amendments "shall be effective and implemented upon such dates as the Secretary of Agriculture may prescribe, taking into account the need for orderly implementation." OBRA § 117, 7 U.S.C. § 2012 note (1982). Accordingly, on September 4, 1981, the Secretary published "interim" rules in the *Federal Register* that were made effective immediately and were to be implemented fully by the states by October 1, 1981. 46 Fed.Reg. 44,712 (1981) (interim rules). Although the Secretary made the interim rules effective immediately, he stated that USDA would receive comments from the public for 120 days and would publish final rules sometime thereafter. *Id.* Final rules were in fact promulgated on November 19, 1982. 47 Fed.Reg. 52,328 (1982). Thus there was no public notice or comment before the "interim" rules took effect on September 4, 1981, but, by virtue of the September 4 rules, there was both notice and opportunity for comment before the "final" rules took effect in November 1982.

The September 1981 *Federal Register* statement declared that the Secretary had found good cause to dispense with notice, comment, and prior publication of the new "interim" rules: these procedures would be "impracticable, unnecessary, and contrary to the public interest." 46 Fed.Reg. at 44,712. The principal basis for this determination was cost savings. Congress and USDA expected annual savings in excess of one billion dollars from the 1981 amendments, *see* S.Rep. No. 139, *supra* p. 178, at 13, *reprinted in* 1981 U.S.Code Cong. & Ad.News at 405; 46 Fed.Reg. at 44,712, and the only way to accomplish such savings was to have the amendments implemented by October 1, 1981, the first day of the new fiscal year, 46 Fed.Reg. at 44,712. The Secretary estimates that notice, comment, and thirty-day publication procedures would have required at least three months. Brief for the Appellant at 13 n. 14. It was therefore impossible to follow section 553 procedures and meet the Secretary's self-imposed October 1 deadline.

The cost saving resulting from immediate implementation was also said to serve the public interest for one other reason. Congress had appropriated funds for the Food Stamp Program for fiscal year 1982 assuming that the anticipated savings would in fact be achieved. If, due to delay in implementing the amendments, the program ran over budget, benefits might have to be reduced for all beneficiaries. The Secretary felt it was better to eliminate or reduce benefits for some recipients on October 1, rather than risk having to cut benefits for all recipients later in the year. 46 Fed.Reg. at 44,712.

Plaintiffs brought this class action in August of 1982 to enjoin enforcement in New Hampshire of the regulation implementing the new "parent-child" household restrictions. Although there were several issues raised in the initial litigation, the sole issue on appeal is the propriety of the district court's injunction, voiding the rule and requiring new rulemaking. The district court's decision rested on its finding of a violation of section 553.

The plaintiffs' contention is fairly straightforward. The Secretary is bound by 7 U.S.C. § 2013(c) (1982) to follow 5 U.S.C. § 553, and the latter section requires notice-and-comment rulemaking except for

"interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice [, or] when the agency for good cause finds ... that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest," *id.* § 553(b). The plaintiffs argue, and the district court held, that none of these exceptions apply to the regulation in question here.

In promulgating the rule, the Secretary relied on the good cause exception. 46 Fed. Reg. at 44,712; *see supra* p. 178. His position in this litigation, however, is more complicated. He now contends that the rule was composed of two parts: the text of the rule, and the effective date. The Secretary argues that because the text of the household definition regulation merely restates the statute's terms in a slightly different way, it is an interpretative rule, hence exempt from notice and comment. For purposes of this litigation the Secretary is willing to concede that his choice of an effective date for the statute amounted to a substantive rule subject to section 553, but he argues that there was good cause to forego section 553's procedure: the only reason to have entertained public comment would have been to accept a later effective date, and that would have been contrary to the public interest, which, as indicated by OBRA, was in saving money through restricting program eligibility. The final part of the Secretary's argument is that regardless of the validity of the rule issued in 1981, Congress mandated in 1982 that the new definition of household take effect no later than September 8, 1982. Therefore, even if the district court was correct in requiring benefits to be paid on the basis of the old definition after OBRA was enacted, the new definition still must be given effect as of September 8, 1982. We discuss each of these contentions hereafter.

## II. Interpretative Rule Exception

We analyze in two ways the Secretary's claim that the rule is interpretative. First, we discuss the import of the Secretary's failure to make this claim when the rule was published. Second, we look to the factors established in case law to distinguish between legislative and interpretative rules. Both paths lead us to reject the Secretary's present position.

### A. Late Arising Claim

The Secretary's argument based on the interpretative rule exception runs into trouble immediately, because he adverted only to the good cause exception when he promulgated the rule. He never suggested in 1981 that any portion of the rule was merely interpretative. The court raised this issue at oral argument, and counsel for the Secretary gave three answers. First, the Secretary is not required to denominate certain rules as interpretative when he issues them. In contrast, the APA specifically requires that when an agency relies on the good cause exception it must "incorporate[ ] the finding and a brief statement of reasons therefor in the rules issued," 5 U.S.C. § 553(b)(B) (1982). Second, it is cumbersome for an agency to label each part of long regulations according to whether they are substantive, interpretative, policy-making, etc. Third, regardless of how the Secretary explained himself at the time, whether a rule is substantive or interpretative is a question of law ultimately to be decided by the court.

These responses are unpersuasive, particularly in the circumstances of this case. Although it is true that the APA requires a statement regarding good cause but not interpretative status when a rule is issued, the distinction does not compel the negative inference counsel would have us draw. When an agency promulgates a rule without following section 553 procedures, it will *always* be important to know that the agency believes that the rule nevertheless has legislative effect. Because a rule promulgated pursuant to an agency's legislative authority is entitled to greater deference by the courts than are interpretative rules or policy statements, *see, e.g., Batterton v. Francis*, 432 U.S. 416, 424–26, 97 S.Ct. 2399, 2404–06, 53 L.Ed.2d 448 (1977); *Nason v. Kennebec County CETA*, 646 F.2d 10, 18 (1st Cir.1981), one runs greater risks in not

following legislative rules. It is therefore important to inform the public at the time of promulgation that a rule is legislative, and this information is conveyed by invoking the good cause exemption. In contrast, although it may be helpful to state at the time of promulgation that a rule is interpretative, not doing so is less likely to affect the conduct or the potential liabilities of the regulated population. Moreover, exemption from section 553 for legislative rules is available only in extreme cases. *See infra* p. 184. Congress may well have required a statement of good cause as a cautionary device to reinforce the exceptional nature of the exemption: an agency cannot dispense with section 553 procedures without first finding good cause, and forcing the agency to formulate a coherent and compelling statement of its finding could induce circumspection and help to inhibit unjustified invocation of the good cause exemption. Since Congress had no aversion to casual promulgation of interpretative rules, there is no parallel reason to require a statement of interpretative status at the time of promulgation.

The second response, that such identification is cumbersome, is refuted by the Secretary's own actions. In promulgating the interim rule in 1981, the Secretary wrote an extensive preamble, discussing the major points of the rule. *See* 46 Fed.Reg. at 44,712–21. We do not perceive any great difficulty in adding a brief statement where appropriate that a particular part of the rule is merely interpretative. In fact, the Secretary included such statements when he promulgated the final rule in 1982. Although most of the final rule was based on the interim rule and had thus been subject to the 120-day comment period announced in 1981, some aspects were completely new, taking into account statutory amendments enacted later in 1981 and 1982, and had never been subject to public comment. The Secretary mentioned his reasons in each instance for not having provided for public comment. *See* 47 Fed.Reg. at 52,330, 52,-331. Although his statements did not make clear the legal basis for dispensing with notice and comment procedures, their pres-

ence indicates that it is not overly cumbersome to give some contemporaneous indication of all the reasons for dispensing with section 553 procedures.

Counsel's final response, that it is up to the courts to determine whether a rule is legislative or interpretative, is correct, *cf. CBS v. United States,* 316 U.S. 407, 416, 62 S.Ct. 1194, 1200, 86 L.Ed. 1563 (1942) ("label placed . . . by the Commission is not necessarily conclusive, for it is the substance . . . which is decisive"), but it is not really responsive to the question we face. An agency should not hesitate to state that a rule is interpretative simply because a court might possibly reject that characterization later. A court will always at least be interested in the agency's statement of what it thought it was doing at the time it promulgated a rule. *See British Caledonian Airways v. CAB,* 584 F.2d 982, 992 (D.C.Cir.1978) ("agency's views are generally given deference"). Indeed, there is great value to a reviewing court in having the actual reasons relied upon at the time the challenged action was taken. *Cf. Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 419, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971) (rejecting post hoc rationalizations); *SEC v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943) ("[T]he courts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review."). Holding a decision maker to his contemporaneous statement of reasons in most instances will encourage better considered judgments and will discourage the attitude of "act now, make up reasons later."

■ Considerations of fairness also counsel great skepticism toward after-the-fact rationalizations, particularly in circumstances such as those before us. Here the Secretary made a determination in September of 1981 that he could promulgate rules without notice-and-comment procedures, and he recognized that he had to give some reason for acting so quickly. At the time, when his mind was focused on the problem, he never mentioned the possibility that some or all of the new regulations might be inter-

pretative. His reliance on the good cause exemption was likely to lead the public to believe that the rules were intended to be legislative, and this could reasonably affect both public response to the rules, *see supra* pp. 179–180, and litigation efforts. It seems both unfair and disingenuous to allow the Secretary to say later that he didn't mean it. In sum, although the courts may make the final determination of whether a rule is legislative or interpretative, a highly relevant datum in the determination is the agency's contemporaneous characterization of its action.

For all the reasons given above, we are inclined to give little weight to an agency's post hoc reconstruction of its efforts and intentions. The district court also treated with some skepticism the Secretary's argument that the rule was interpretative, finding it to be "late arising." *Levesque v. Block,* No. C82–437–L, slip op. at 10 (D.N.H. Jan. 26, 1983) [hereinafter cited as Dist.Ct. Op.]. It went on, however, to address the claim on the merits and held that the rule was legislative. We agree, and largely for the same reasons, as we discuss next.

### B. *Legislative vs. Interpretative Rules*

The Secretary relies on *Gibson Wine Co. v. Snyder,* 194 F.2d 329 (D.C.Cir.1952), cited by the district court, to distinguish legislative from interpretative rules:

Administrative officials frequently announce their views as to the meaning of statutes or regulations. Generally speaking, it seems to be established that "regulations", "substantive rules" or "legisla-

tive rules" are those which create law, usually implementary to an existing law; whereas interpretative rules are statements as to what the administrative officer thinks the statute or regulation means.

*Id.* at 331. *See also Cabais v. Egger,* 690 F.2d 234, 238 (D.C.Cir.1982) (quoting *Gibson Wine* as "proper test"); *Nason v. Kennebec County CETA,* 646 F.2d 10, 18 (1st Cir.1981) (quoting *Gibson Wine* ). On this basis, the Secretary argues that the substance of the household definition is interpretative because it largely restates the statute; it is simply his view of what the statute means. And because the rule adds no requirements that were not already in the statute and thus does not create law, it cannot be a legislative rule. *Cf. Cabais,* 690 F.2d at 238 (challenged rule is interpretative because "[i]t does not grant or deny rights and it does not impose obligations which do not already exist in the statute").

Plaintiffs also rely on *Gibson Wine,* but they argue that it means that "when an agency undertakes to give a rule the full force and effect of law, which was previously not in effect, the rule is *not* an interpretative rule." Brief for the Plaintiffs-Appellees at 25 (emphasis in original). Since the new restrictions in the household definition were not in effect prior to the promulgation of the new regulations, plaintiffs contend they must be legislative.

There are reasons to be dissatisfied with the construction given by both sides of the law expressed in *Gibson Wine.*[1] If plaintiffs mean that any rule that an agency

---

1. The facts of *Gibson Wine* lend some support to the Secretary's version of the holding, but not to his application of the law to the facts before us. There an admittedly legislative regulation required that wines be labeled according to the fruit from which they were made, and a Treasury Department official later stated that the regulation did not permit wine made from boysenberries to be labeled "blackberry wine," even though the boysenberry is a variety of blackberry. The court held that the latter statement was merely an interpretation of the regulation. *See* 194 F.2d at 330–32. Inasmuch as the existing regulation required labeling by source, the new statement imposed no new obligations and thus did not create law. To

this extent *Gibson* supports the Secretary's interpretation. Precisely because there was an existing duty to label by source, however, *Gibson* does not support the Secretary's position in this case. There is little difficulty in saying that the official's statement in *Gibson* was merely his view of what the labeling regulation required. There is considerable difficulty in saying that the regulation before us merely expresses the Secretary's view of OBRA, for the regulation was issued in rulemaking necessary to make OBRA effective, and thus "implementary" of that legislation, and it was never suggested that the regulation stated an interpretation or opinion.

intends to be effective must be legislative, they are plainly wrong. Every rule is intended to have some effect, and although courts are not bound by interpretative rules, courts often follow agency interpretations, *see, e.g., Skidmore v. Swift & Co.,* 323 U.S. 134, 139–40, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). At the same time, we cannot believe that the Secretary really means that any rule that restates its authorizing statute is necessarily interpretative. If that were correct, then such restatements, even if they were promulgated pursuant to full notice-and-comment procedures and designated by the agency as legislative, would not be binding on the courts. We would have thought, however, that these rules generally would have to be upheld unless arbitrary and capricious.[2]

In resolving this point, the district court recognized that the distinction between legislative and interpretative rules has to do in part with the authority under which the rule is promulgated. "The question whether a rule is legislative or interpretative thus depends upon whether or not it is issued pursuant to a grant of lawmaking power." 2 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 7.10, at 52 (2d ed. 1979). If the answer is yes, then the rule is legislative, it must be issued pursuant to section 553 procedures, and it is binding unless defective for one of the reasons given in 5 U.S.C. § 706(2) (1982). Where, as with USDA, an agency has authority to issue both legislative and interpretative rules, "[t]he crucial question is whether the agency intends to exercise delegated [lawmaking] power ..., and the intent usually can best be found in what the agency says at the time of issuing the rules." K. DAVIS,

ADMINISTRATIVE LAW OF THE SEVENTIES § 5.03, at 148 (1976). *Cf. National Nutritional Foods Association v. Weinberger,* 512 F.2d 688, 698 n. 8 (2d Cir.) (" 'interpretive rules' refers only to rules not intended to have the force of law"), *cert. denied,* 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975). *See also* Dist.Ct.Op. at 10.

As noted by the district court, the circumstances surrounding the promulgation of this rule suggest that it was meant to have legislative effect. When the household definition rule was promulgated, the Secretary called it a "major" rule "because the rule will have a significant annual effect on the economy." 46 Fed.Reg. at 44,712. He also stated that "implementation of these provisions will have an adverse effect on many potential applicants and some current participants." *Id.* And, of course, he relied on the good cause exception, which, as noted earlier, *supra* pp. 179–181, suggests that he believed that but for that exception the rule would have been subject to section 553, hence not interpretative. *See* Dist. Ct.Op. at 10–11.

The Secretary argues that the first two findings are irrelevant for, as a substantial number of courts and commentators have stated, *see, e.g., Cabais,* 690 F.2d at 237; 2 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 7.8, at 39 (2d ed. 1979), the fact that a rule has a substantial impact does not of itself make the rule legislative. We agree that substantial impact does not make a rule legislative, but whether a rule has a substantial impact may be relevant in construing the intent of the agency in issuing the rule.

In this case, there is a great deal of evidence, in addition to the matters cited by

---

2. In another case, the government came closer to taking the surprising position that a rule could be interpretative even if promulgated through full procedures and purporting to be legislative: "Whether or not an agency cites its general rulemaking authority as the 'authority' for issuance of an interpretative rule, while it may affect the degree of deference accorded to such rules, should not affect the interpretative nature of such rules." Brief for the Federal Appellants at 29 n. 27, *Cabais v. Egger,* 690 F.2d 234 (D.C.Cir.1982). *But see* 2 K. DAVIS,

ADMINISTRATIVE LAW TREATISE § 7.11, at 57 (2d ed. 1979):

> When an agency is exercising its delegated power under [a statute authorizing legislative rulemaking], its regulations may repeat the words of the statute, may paraphrase those words, may interpret those words, may go slightly beyond those words, and may go far beyond those words; the regulations clearly may be legislative even when they interpret the statute.

the district court, to suggest that the Secretary fully intended this rule to have legislative effect. The Food Stamp Program has never been self-executing. Congress explicitly stated "the Secretary is authorized to formulate and administer a food stamp program." 7 U.S.C. § 2013(a) (1982). In this very litigation the Secretary stated that the final rules were issued pursuant to "his duty to ensure nationally uniform implementation of the Food Stamp Program." Federal Defendants' Memorandum of Points and Authorities in Support of Motion for Summary Judgment at 7. Although the Secretary is required to "establish uniform national standards" regarding only income eligibility, 7 U.S.C. § 2014(b), he is also directed to promulgate any regulations necessary or appropriate to carrying out the mandates of the program, *id.* § 2013(c). From the program's inception, the Secretary has issued rather detailed regulations regarding all aspects of the program, and these are deemed mandatory upon the states. *See id.* § 2020(d), (e)(6)(A). States which do not comply with these regulations are subject to actions for mispayment, *see id.* § 2020(g), 2025; 7 C.F.R. part 276, and in promulgating the interim regulations at issue here the Secretary threatened that USDA "will move swiftly against State agencies that do not meet their timeframes" for implementing the new regula-

tions, 46 Fed.Reg. at 44,720. Finally, the regulations he was amending had been issued pursuant to section 553 procedures and presumably were considered legislative rules. This legislative and regulatory framework heavily supports the conclusion that the Secretary intended the new regulations to have the force of legislative rules under 7 U.S.C. § 2013.

The Secretary in effect asks us to view the household definition rule in isolation from the rest of the proceedings of which it was a part and to hold that it is interpretative, since the rule's household definition is similar to the statute's household definition. This approach is unrealistic. In promulgating the rule, the Secretary did nothing to separate its various elements and gave no reason to believe that some elements were legislative and others interpretative. In contrast, he gave every indication that all aspects were legislative.[3] It is inconceivable that he would have allowed the New Hampshire State Plan of Operation to include a different household definition that included, for example, some of the distinctions that plaintiffs have suggested here and that other people suggested during the comment period.[4]

In short, the fact that the household definition rule resembles the household definition statute is not enough to demonstrate

**3.** This differs from the circumstances present in *Cabais v. Egger,* upon which the Secretary relies. The administrative letters in *Cabais* purported to be only advisory. Moreover, although the court largely accepted that characterization, it still found some portions legislative. *See* 690 F.2d at 238–39. The approach in *Cabais* differs from ours to the extent that the court there was willing to sift among the various provisions of the letters to determine which were legislative and which interpretative. Without expressing any opinion on whether that approach is desirable, we note that both approaches tend toward requiring section 553 procedures. There, despite the agency's initial characterization of its actions as advisory, the court found some aspects went beyond advice or interpretation and required notice-and-comment rulemaking. Here we hold the agency to its initial characterization, implicit or explicit, that its action was legislative and subject to section 553.

**4.** For the same reasons, the other distinction the Secretary asks us to draw—between the text of the rule and the effective date—is untenable. It is legally possible that the Secretary could have implemented the 1981 OBRA amendments by issuing a rule that said simply that the statute would be effective immediately and implemented by October 1, 1981. In such circumstances it would be difficult to hold that the Secretary made a substantive decision about the terms of the household definition, though we need not rule on the matter now. The important point is that the Secretary did not follow this course, and because the Food Stamp Program is so dependent, practically if not legally, on regulations for its administration, it is hard to imagine the Secretary having omitted the household definition from the regulations. The Secretary decided both when and how to implement the new definition. Both decisions were substantive and both parts of the rule are legislative rules subject to section 553.

that the former is an interpretative rule. We hold, therefore, that the new definition codified at 7 C.F.R. § 273.1(a)(2)(ii) (1982) was promulgated by substantive rule.

### III. Good Cause Exception

Because the new definition is substantive, the interim rule is invalid unless, as the Secretary announced, there was good cause for dispensing with section 553 procedures. The Secretary's argument before this court centers on his contention that his only substantive decision was the selection of an implementation date. We have rejected that argument, and therefore we must determine whether the reasons the Secretary gave in the September 1981 notice but largely ignored here—essentially lack of time and a desire to save money—provide good cause to dispense with section 553 procedures.

The issue of what constitutes good cause is not new in this circuit. We have stated that this exception "is narrowly construed." *Kollett v. Harris,* 619 F.2d 134, 145 (1st Cir.1980). We noted in *Kollett* that "time constraints rising from the need to implement new legislation [is] a factor to consider," *id.,* but found the justification inadequate in that case, as had several other courts in various circumstances, *see, e.g., American Iron & Steel Institute v. EPA,* 568 F.2d 284, 292 (3d Cir.1977). We also analyzed the three bases the statute provides for a claim of good cause: impracticability, lack of necessity, and the public interest, 5 U.S.C. § 553(b)(B) (1982). Impracticability was said to exist when the agency could not both follow section 553 and execute its statutory duties. *See* 619 F.2d at 145. Public procedures are "unnecessary," we concluded, when the regulation is technical or minor. *See id.* Finally, " '[p]ublic interest' supplements the terms 'impracticable' or 'unnecessary'; it requires that public rule-making procedures shall not prevent an agency from operating and that, on the other hand, lack of public interest in rule-making warrants an agency to dispense with public procedure." S.REP. No. 752, 79th Cong., 1st Sess. 14 (1945), *reprinted in*

SENATE JUDICIARY COMMITTEE, 79TH CONG., 2D SESS., ADMINISTRATIVE PROCEDURE ACT LEGISLATIVE HISTORY 185, 200 (1946), *quoted in Kollett,* 619 F.2d at 145.

█ None of these factors suggest that good cause existed in this case. First, Congress never suggested that it intended for the Secretary to abandon public participation in making these rules. Although there is reason to believe that Congress wanted USDA to act with dispatch, the language used in the statute left the effective and implementation dates wholly within the Secretary's discretion, subject only to the requirement that they be selected with a view toward "orderly implementation." OBRA § 117, 7 U.S.C. § 2012 note (1982). Other courts, moreover, have evolved a presumption that Congress expects agencies to comply with the APA, even at the expense of short statutory time constraints, unless the statute expressly dictates otherwise. *See Philadelphia Citizens in Action v. Schweiker,* 669 F.2d 877, 885 (3d Cir.1982) (citing *Sharon Steel Corp. v. EPA,* 597 F.2d 377, 380 (3d Cir.1979)). Thus had Congress mandated implementation by October 1, there would still be some question whether that fact alone would provide good cause for dispensing with section 553 procedures. But Congress did not set any time constraints. The October 1 deadline the Secretary followed was his own creation and of no relevance to the question of good cause. We conclude, therefore, that compliance with the APA was not "impracticable"; plainly the Secretary could have complied with section 553 without interfering with his duties under OBRA.

█ It is equally clear that public participation was not "unnecessary." The Secretary announced that the new rule was "major," with a significant impact on the economy and on the eligibility of many participants and applicants. It is hard to imagine that this is the sort of technical or minor rule that Congress had in mind when speaking of "unnecessary" rulemaking.

█ Finally, there is the question of whether notice-and-comment rulemaking

would have been contrary to the public interest, which the Secretary emphasized most in promulgating the rule. He suggested that OBRA expressed a congressional determination that the public interest inhered in saving money and that immediate implementation therefore was necessary. We believe that although Congress obviously intended to save money through OBRA, *see generally Dickenson v. Petit,* 692 F.2d 177, 181 (1st Cir.1982) (cost-saving intent), its expressed concern was for "orderly," not immediate, implementation. *See supra* pp. 178, 184. The notion of "orderly implementation" is by no means at odds with compliance with section 553. *Cf. Philadelphia Citizens in Action,* 669 F.2d at 882–84 (because OBRA made AFDC amendments effective on October 1, there was good cause to dispense with section 553 procedures).[5] Delay of a few months for rulemaking, moreover, would not have prevented savings throughout the remainder of the fiscal year.

The Secretary also suggested that it was in the public interest to end or reduce benefits for some participants immediately rather than to have to reduce benefits for all participants later, due to budget shortfalls. 46 Fed.Reg. at 44,712; *see supra* p. 178. Perhaps this is so, but if Congress was troubled by that prospect, it could have mandated immediate implementation. Moreover, the passage quoted above from the Senate report suggests that Congress

meant something different by using "public interest" in section 553. Congress's view seems to have been that any time one can expect real interest from the public in the content of the proposed regulation, notice-and-comment rulemaking will not be contrary to the public interest. This is such a case. Not only did plaintiffs show interest in the content of the regulation, but many commentators participated in the final rulemaking when given an opportunity, and the household definition in question here generated responses from fifteen commentators. *See* 47 Fed.Reg. at 52,329–30. The Secretary saw fit to modify some of the interim rules, including the household definition, in light of the comments received. *See id.* Under these circumstances, we cannot conclude that the public interest as conceived of in section 553 was served by circumventing section 553's procedures.

Promulgation of the interim rule was not exempt from the requirements of section 553 due to "good cause," and the interim rule's amendment to the household definition, found in 7 C.F.R. § 273.1(a)(2)(ii) (1982), is void for failure to comply with section 553.

## IV. The Remedy

### A. *The Effect of the 1982 Amendments*

In 1982 Congress passed another Omnibus Budget Reconciliation Act with amendments to the Food Stamp Program. *See* Omnibus Budget Reconciliation Act of 1982 ("OBRA 1982"), Pub.L. No. 97–253, §§ 140–

---

5. *Philadelphia Citizens in Action* perhaps provides the greatest support for the Secretary in that the Third Circuit found good cause for dispensing with public rulemaking for Aid to Families with Dependent Children rules promulgated pursuant to OBRA. None of the factors that convinced the Third Circuit are present here, however. There the OBRA amendments in question were made effective *by statute* on October 1. *See* 669 F.2d at 882–84. Here Congress left the effective date to the Secretary's discretion. There, although the statute did not require that regulations be promulgated on any particular date, the October 1 effective date and the need for HHS guidance implied a statutory mandate for immediate promulgation. *Id.* at 884–85. Here implementation was left to the Secretary's discretion, to be guided by a concern for order. A quite reasonable interpretation of that require-

ment is that the APA be followed. Finally, the Third Circuit found it important that only an HHS regulation, not a statute, requires AFDC regulations to be promulgated pursuant to section 553: "Congress surely is not obliged to state explicitly that statutes it enacts fit within exceptions to regulations or policies formulated solely by an administrative agency. Thus, congressional silence [regarding APA compliance] in this instance in no way reveals an intent on its part that the good cause exception not apply." *Id.* at 885–86. Here, in contrast, Congress has itself required that Food Stamp Program regulations be promulgated pursuant to section 553, *see supra* p. 177, and thus congressional silence is consistent with the view that the good cause exception should not apply, *see supra* p. 184 (regarding presumptions from congressional silence).

193, 96 Stat. 763, 772–89 (codified at 7 U.S.C. §§ 2011–2029 (1982)). In that Act, Congress directed that the amendments made in the 1981 OBRA, notwithstanding the effective and implementing provisions of the 1981 act, "shall take effect on the earlier of the date of the enactment of this subtitle or the date on which such amendments became effective pursuant to [the 1981] Act." *Id.* § 192(a), 96 Stat. at 788 (codified at 7 U.S.C. § 2012 note (1982)). The Secretary argues that if, as we have concluded, the interim rule was not valid, this provision requires that we give effect to the new household definition as of September 8, 1982, the date of enactment of OBRA 1982. We disagree.

Ordinarily one would think that an effective date is the date on which a provision begins to be binding legally. Legal effectiveness can be made subject to implementing regulations, however, as was done, for example, in the 1981 OBRA. *See supra* pp. 177–178. The Secretary argues that because no such limitation was placed in OBRA 1982, the Act made the 1981 amendments self-executing.

The legislative history regarding section 192(a) suggests, contrary to the Secretary's position, that Congress understood that the 1981 amendments would not be binding upon states and individuals until there were new regulations. The Senate had included a provision that specified both a particular date on which the 1981 amendments would become effective and a later date by which those amendments were to be implemented. *See* S. 2774, 97th Cong., 2d Sess. § 153 (1982). The House version, adopted in the final bill, contained only an effective date. There was no House committee report and the conference report did not explain the purpose for the House's version or why it was accepted, but only that the conference adopted it. *See* H.R.REP. No. 759, 97th Cong., 2d Sess. 74 (conference report), *reprinted in* 1982 U.S.CODE CONG. & AD.NEWS 1641, 1846, 1869.

In its report, the Senate Agriculture Committee explained that the purpose for specifying effective and implementation dates was to expedite implementation. "The Committee has been concerned by the slow pace with which some of the provisions enacted in recent years have been implemented. . . . To address concerns about the overly broad discretion as to implementation granted to Administrations in recent years, the Committee adopted specific dates by which . . . previously-passed legislation . . . [must] be fully implemented." S.REP. No. 504, 97th Cong., 2d Sess. 81, *reprinted in* 1982 U.S.CODE CONG. & AD.NEWS 1641, 1719. After outlining the provisions yet unimplemented and the dates by which USDA thought implementation would be completed, the committee expressed its "hope[] that the Department can expedite the issuance and implementation of the regulations needed to carry out these policy changes." *Id.* at 83, *reprinted in* 1982 U.S.CODE CONG. & AD.NEWS at 1721.

It is clear that at least the Senate Agriculture Committee saw a difference between an effective date and an implementation date, and it believed that even after the amendments became "effective" they would not be self-executing; "implementation" would be necessary.[6] This is not surprising. Congress directed the Secretary to issue regulations, 7 U.S.C. § 2013(c) (1982), and Congress requires the states to comply with those regulations, *id.* § 2020(e)(6). Typically the Secretary promulgates regulations and then gives the states some reasonable period of time within which to implement the new provisions. Regulations also provide a method by which states may seek waivers of obligations imposed by USDA. *See* 7 C.F.R. § 272.3(c) (1983). Presumably Congress was cognizant of these practices when it enacted OBRA 1982. Aware of the need for USDA and state implementation procedures, and provided with an opportunity to set an outside time limit for comple-

---

**6.** The Senate bill would have given until June 1, 1983, for implementation, a period of nearly nine months after the "effective" date of September 8, 1982. S. 2774, *supra* p. 186, § 153. Such a long period of time for implementation is inconsistent with the notion that the law would be self-executing.

tion of those procedures, Congress expressly chose not to set such limits. Thus although ordinarily we might find that an effective date standing alone in a statute makes the statute self-executing, that interpretation would be unreasonable in these circumstances.

Finally, we note that the Secretary has been inconsistent in his interpretation of the meaning of "effective date." The food stamp amendments added in 1982 were to "take effect on the date of the enactment of this subtitle," September 8, 1982. OBRA 1982, § 193(a), 96 Stat. at 789 (codified at 7 U.S.C. § 2012 note (1982)). The Secretary promulgated interim rules implementing the 1982 amendments on December 14, 1982, and although acknowledging that OBRA 1982 mandated a September 8 effective date, the Secretary made only "[c]ertain provisions of this rulemaking ... effective retroactively to September 8, 1982. All of the other provisions of this rule are effective on the date of publication," 47 Fed.Reg. 55,903 (1982), subject to implementation by the states no later than February 1, 1983, *id.* at 55,908. If, as the Secretary maintains in this court, the law has full force on its effective date, then he had no authority to allow deferral of state implementation until nearly five months later. We do not express any opinion on his authority regarding the December 1982 rules. We recite these facts only to point out that the Secretary has been inconsistent in his interpretation of the governing statute. Had he been consistent in his interpretation, we might have deferred to his construction of the statute over our own. *Cf. General Electric Co. v. Gilbert*, 429 U.S. 125, 141–43, 97 S.Ct. 401, 410–11, 50 L.Ed.2d 343 (1976) (inconsistent agency interpretation of own rules entitled to less weight). In the event, we adhere to our view that OBRA 1982 does not bar this court from granting relief beyond September 8, 1982.

### B. *The Effect of the November 1982 Rule*

When the Secretary promulgated the interim rule in September 1981 he opened a 120-day comment period, and the final rule adopted on November 19, 1982, reflected some changes made in light of those comments. The household definition challenged here was changed only minimally. The final issue we must address is whether the final rule promulgated in November 1982 is legally valid. This question has not really been addressed by the parties, perhaps because it has generally been held that a rule found invalid for failure to provide for notice and comment cannot be saved by providing for comment after promulgation. *See New Jersey v. United States EPA*, 626 F.2d 1038, 1049 (D.C.Cir.1980); *United States Steel Corp. v. United States EPA*, 595 F.2d 207, 214–15 (5th Cir.1979). Under the circumstances of this case, however, we conclude that the household definition promulgated in the final rule in November 1982 is a valid rule.

The general rule that frowns upon post-promulgation comment periods reflects the concerns that underlie section 553. Public comment contributes importantly to self-governance and helps ensure that administrative agencies will consider all relevant factors before acting. To serve these purposes, notice and the opportunity for comment must come at a time when they can feasibly influence the final rule. Ordinarily this can only take place before a rule takes effect. The agency at that time has no stake in any particular rule; it will not have to worry about the costs of upsetting the status quo by amending a rule only recently implemented.[7] Similarly, citizens

---

**7.** The standard of judicial review affects this calculus as well. Courts can ensure that the agency considers all relevant factors, *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), but as long as the agency's final decision is not arbitrary, capricious, or beyond the scope of the law, it must be upheld. It is difficult for a court to know whether a policy choice suggested by a commentator has seriously engaged an agency's attention; for the most part we can only determine whether the suggestion was considered and given a rational, even if not wise, response. Because agencies are even less likely to consider fully public comment after a rule is in place, courts will feel

will recognize that the agency is less likely to pay attention to their views after a rule is in place, and therefore the public is less likely to participate vigorously in comment.

Permitting the submission of views after the effective date is no substitute for the right of interested persons to make their views known to the agency in time to influence the rule in a meaningful way. As *Kelly* [*v. United States Dep't of Interior*, 339 F.Supp. 1095, 1101 (E.D.Cal. 1972)] states:

"We doubt that persons would bother to submit their views or that the Secretary would seriously consider their suggestions after the regulations are a *fait accompli*."

*City of New York v. Diamond*, 379 F.Supp. 503, 517 (S.D.N.Y.1974), *quoted in New Jersey v. United States EPA*, 626 F.2d at 1049; *United States Steel Corp. v. United States EPA*, 595 F.2d at 214–15. In view of these "psychological and bureaucratic realities, . . . Congress specified that notice and an opportunity for comment are to *precede* rule-making." *New Jersey v. United States EPA*, 626 F.2d at 1050 (emphasis in original).

Courts have, however, at times taken account of the quality of an agency's response to post-promulgation comments in determining whether to uphold a rule. When the response suggests that the agency has been open-minded, the presumption against a late comment period can be overcome and a rule upheld. *See Republic Steel Corp. v. Costle*, 621 F.2d 797, 804 (6th Cir. 1980); *United States Steel Corp. v. United States EPA*, 605 F.2d 283, 291 (7th Cir. 1979), *cert. denied*, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980); *see also New Jersey v. United States EPA*, 626 F.2d at 1050 (distinguishing the previous two cases). Indeed, at least one court has mandated a post-promulgation comment period after determining that an emergency gave good cause to dispense with notice and comment before the promulgation of an interim rule. *American Federation of Government Employees v. Block*, 655 F.2d 1153, 1157–59

(D.C.Cir.1981). This appears to comport with congressional intent. *See* S.Rep.No. 752, *supra* p. 184, at 14 (when good cause exists, "the agency may promulgate the necessary rule immediately and rely upon supplemental procedures in the nature of a public reconsideration of the issued rule to satisfy the requirements of this section"), *reprinted in* Senate Judiciary Committee, *supra* p. 184, at 200; H.R.Rep. No. 1980, 79th Cong., 2d Sess. 24 (1946) (same), *reprinted in* Senate Judiciary Committee, *supra* p. 184 at 233, 258.

There is, of course, a difference between, on the one hand, mandating a post-promulgation comment period when exigent circumstances foreclose prior public comment, as in *Block,* and, on the other hand, allowing post-promulgation comment to suffice when good cause did not exist, as in our case. When pre-promulgation comment is impossible, comment after the fact is better than none at all. When pre-promulgation comment is possible, however, one does not want to encourage the circumvention of section 553 by accepting post-promulgation procedures. Nevertheless, at times an agency may be able to present evidence of a level of public participation and a degree of agency receptivity that demonstrate that a real "public reconsideration of the issued rule" has taken place.

In this case, the Secretary received 130 letters regarding the interim rules. In response, the Secretary made a number of changes in the rules and gave reasonable responses when rules were not changed. With regard to the rule challenged here, the Secretary clarified that the parent-child relationship extends to adoptive and step relations, as well as natural ones, and that this rule takes precedence over other rules relating to household definition. *See* 47 Fed. Reg. at 52,329. The Secretary did not further refine the concept of "living together," a matter of concern to plaintiffs here, but he did not totally foreclose discussion of the issue: he simply left the matter to be decided based on the circumstances of each case. *Id.* Changes in other rules that reflect the

---

even less comfortable with allowing post-promulgation comment periods to substitute for

the public participation mandated by section 553.

concerns of commentators are also apparent. *See id.* at 52,329–31. Although the plaintiffs did not take advantage of the opportunity to comment, this fact does not prove that the comment period was unavailing.

Overall, we believe that the level of public participation and the quality of the Secretary's responses demonstrate that the comment period provided after the September 1981 notice satisfied the requirements and purposes of section 553. Although the public response was not overwhelming, it was enough to apprise the Secretary of matters of public concern, to provide a substantial public airing of relevant issues, and to modify the regulations to suit the Secretary's, the states', and the public's needs. Further rulemaking is therefore neither necessary nor likely to be productive now. Accordingly, we hold that the November 19, 1982, household definition, codified at 7 C.F.R. § 273.1(a)(3) (1983), is valid, and we modify the district court's injunction in the following ways: (1) USDA need not engage in further rulemaking; (2) retroactive benefits, where appropriate under the pre-September 1981 rule, must be paid only for the period ending November 18, 1982.

*It is so ordered.*