975 F.2d 373
 129 A.L.R.Fed. 685
 ALABAMA TISSUE CENTER OF THE UNIVERSITY OF ALABAMA HEALTH
SERVICE FOUNDATION, P.C., an Alabama Corporation, American
Red Cross Tissue Services, a Division of the American Red
Cross, a California Corporation, Lifenet, a Virginia
Corporation, et al., Petitioners,
v.
Louis W. SULLIVAN, Secretary of the United States Department
of Health and Human Services and David Kessler,
Commissioner of the United States Food
and Drug Administration, Respondents.
 No. 91-2738.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 27, 1992.
Decided Sept. 16, 1992.
 
 George M. Burditt (argued), Alan I. Becker, Deborah B. Norton, Burditt & Radzius, Chicago, Ill., for petitioners.
 Don O. Burley, Dept. of Justice, Consumer Litigation, Washington, D.C., Louis W. Sullivan, Washington, D.C., Margaret Porter, Dept. of Health & Human Services, Chief Counsel, Food & Drug Div., Rockville, Md., for respondents.
 
 
 1
 Before COFFEY and MANION, Circuit Judges, and SHABAZ, District Judge.*
 
 
 2
 SHABAZ, District Judge.
 
 
 3
 Six not-for-profit heart valve allograft processors filed a petition for review with this Court contesting the "Notice of Applicability of a Final Rule" ("NAFR") published by the Food and Drug Administration ("FDA") on June 26, 1991 at 56 Federal Register 29,177. The NAFR states that replacement heart valve allografts are subject to the final rule issued by the FDA on May 13, 1987, which requires the filing of a pre-market approval application ("PMA") for all preamendment replacement heart valves and their equivalents. A heart valve allograft is a human heart valve which has been processed and preserved so it can be stored until needed for implantation into a human recipient. Because we conclude that we lack jurisdiction to entertain the petition for review of the NAFR, we dismiss the petition.
 
 BACKGROUND
 Statutory Framework
 
 4
 Provisions establishing a detailed procedure for regulating medical devices were added to the Food, Drug and Cosmetic Act of 1938 by the Medical Device Amendments of 1976 ("FDC Act"). See 21 U.S.C. §§ 360c-360l. The FDC Act defines "device" as:
 
 
 5
 [A]n instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is--
 
 
 6
 (1) recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them,
 
 
 7
 (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or
 
 
 8
 (3) intended to affect the structure or any function of the body of man or other animals, and
 
 
 9
 which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of any of its principal intended purposes.
 
 
 10
 21 U.S.C. § 321(h) (emphasis added).
 
 
 11
 Medical devices are divided into three classes. 21 U.S.C. § 360c(a). Class III devices are the most regulated of the three and require premarket approval in accordance with 21 U.S.C. § 360e. See 21 U.S.C. § 360c(a)(1)(C). A Class III device, in relevant part, is one which cannot be classified as Class I or II for insufficient information to reasonably assure its safety and effectiveness and it "is purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health...." 21 U.S.C. § 360c(a)(1)(C). A Class III device can be exempted from premarket approval if an investigational device exemption ("IDE") is obtained pursuant to 21 U.S.C. § 360j(g).
 
 
 12
 The FDA is required to classify a device in distribution before the enactment of the Medical Device Amendments of 1976 or substantially equivalent to a preamendment device. 21 U.S.C. § 360c. For such a device categorized as a Class III device, the FDA is first required to promulgate a regulation classifying the device pursuant to 21 U.S.C. § 360c(d)(1). The FDA must then promulgate a regulation to require premarket approval under 21 U.S.C. § 360e(b). The FDA cannot require an approved PMA for a preamendment device prior to thirty months after the classification regulation becomes effective or ninety days after the promulgation of the regulation requiring premarket approval, whichever is later. 21 U.S.C. § 351(f)(2)(B).
 
 Administrative Proceedings
 
 13
 In 1979 the FDA issued a proposed regulation classifying replacement heart valves as Class III medical devices pursuant to 21 U.S.C. § 360c. The FDA received no comments on the proposed regulation and accordingly it became final as proposed on February 5, 1980 ("1980 Regulation"). The 1980 Regulation defines "replacement heart valves" as:
 
 
 14
 [A] device intended to perform the function of any of the heart's natural valves. This device includes valves constructed of prosthetic materials, biologic valves (e.g., porcine valves), or valves constructed of a combination of prosthetic and biologic materials.
 
 
 15
 21 C.F.R. § 870.3925(a).
 
 
 16
 The FDA then issued a proposed regulation in 1986 requiring (i) the filing of a PMA or a product development protocol ("PDP") for preamendment replacement heart valves and their equivalents; and (ii) an approved PMA or a declared and completed PDP for any other replacement heart valve prior to commercial distribution. The FDA received only one comment and that was unrelated to the proposed regulation. None of the petitioners commented. The regulation, which amended the 1980 Regulation, was finalized on May 13, 1987 ("1987 Regulation"). See 21 C.F.R. § 870.3925(c). The 1987 Regulation required the filing of a PMA or a PDP for preamendment replacement heart valves and their equivalents by December 9, 1987. Id.
 
 
 17
 In 1989, perhaps with some reason for doing so, the FDA began notifying the industry of its intent to subsequently regulate heart valve allografts, believing it to be within its authority pursuant to the prior regulation. For example, in October 1989 the Center for Devices and Radiological Health of the FDA participated in a workshop on human heart valves sponsored by the American Association of Tissue Banks. Further, on August 20 and 21, 1990 the Circulatory System Devices Panel, an advisory committee of the FDA, held a public hearing to assist the heart valve allograft processors in subsequently complying with the premarket approval. The FDA's proposed guidelines concerning the regulation of heart valve allografts were discussed at this meeting.
 
 
 18
 On June 26, 1991 the FDA published the NAFR. The summary of the NAFR states:
 
 
 19
 The Food and Drug Administration (FDA) is issuing a notice to clarify that replacement heart valve allografts, devices, are subject to a final rule that was issued by FDA on May 13, 1987, requiring the filing of a premarket approval application (PMA) for all preamendment replacement heart valves, and those substantially equivalent to replacement heart valves. PMA's or investigational device exemptions (IDE's) will be required as described herein.
 
 
 20
 56 Fed.Reg. 29,177. The NAFR required an approved PMA or IDE to be "in effect" by August 26, 1991. The FDA has extended the "effective date" to June 30, 1992, which has been further extended by the Court pending its decision.
 
 
 21
 Petitioners have also filed a second action challenging the NAFR in the United States District Court for the Northern District of Illinois.Litigation
 
 
 22
 Petitioners, six not-for-profit heart valve allograft processors, filed a petition for review of the NAFR with this Court on July 25, 1991. Subsequently, petitioners filed a motion for a stay of administrative action pending review and a motion to supplement the record on review. Respondents filed a motion to dismiss for lack of jurisdiction. We denied petitioners' motion for a stay and ordered that all other issues be heard by the merits panel. On June 26, 1992 petitioners filed a motion for stay pending the decision of this Court which was granted.
 
 DISCUSSION
 
 23
 As a preliminary matter, we deny Petitioners' Motion to Supplement the Record on Review pursuant to Rule 16 of the Federal Rules of Appellate Procedure and 28 U.S.C. § 2112. The minutes of the various panels and subcommittees of the FDA appear to be neither material nor complete. The notes concerning a 1987 telephone conversation involving an FDA employee is data not included in any statutory definition of the record on review.
 
 
 24
 The threshold question is whether we have jurisdiction to entertain the petition to review the NAFR. The jurisdictional issue overlaps the merits. We restrict our analysis to a discussion of only those issues necessary to resolve the issue of jurisdiction.
 
 
 25
 "Federal courts of appeals are not courts of general jurisdiction; they possess only the jurisdiction conferred upon them by acts of Congress." Russell v. LEAA, 637 F.2d 354, 355 (5th Cir.1981); see also 9 James W. Moore et al., Moore's Federal Practice p 215.02 (2d ed. 1992). The jurisdiction of the United States courts of appeals to directly review the action of administrative agencies is "specially conferred by legislation relating specifically to the determinations of such agencies made subject to review, and prescribing the manner and extent of review." AFL v. NLRB, 308 U.S. 401, 404, 60 S.Ct. 300, 302, 84 L.Ed. 347 (1940).
 
 
 26
 The FDC Act contains specialized provisions for judicial review of "discrete agency actions." Cutler v. Hayes, 818 F.2d 879, 887 n. 61 (D.C.Cir.1987). "Agency action taken under sections silent in this respect is directly reviewable in a district court under some appropriate head of its jurisdiction, for courts of appeals have only such jurisdiction as Congress has chosen to confer upon them." Id.
 
 
 27
 Under 21 U.S.C. § 360g(a) the courts of appeals are granted jurisdiction to review a limited group of regulations or orders concerning medical devices. Any person who is adversely affected by such a regulation or order may file a petition for judicial review with the federal court of appeals in the circuit where the person resides or has a principal place of business no later than thirty days after its promulgation. 21 U.S.C. § 360g(a). The jurisdiction granted to the courts of appeals is extremely narrow. For example, the courts of appeals cannot review an order classifying a preamendment device as class III, but can review an order denying a petition for reclassification of a class III device. See 21 U.S.C. § 360g(a)(3).
 
 
 28
 Petitioners allege that this Court has jurisdiction to review the NAFR pursuant to § 517(a)(4) of the FDC Act, 21 U.S.C. § 360g(a)(4), which provides appellate review over:
 
 
 29
 [T]he promulgation of a regulation under paragraph (3) of section 515(b) [21 USCS § 360e(b)(3) ] requiring a device to have an approval of a premarket application, a regulation under paragraph (4) of that section [21 USCS § 360e(b)(4) ] amending or revoking a regulation under paragraph (3), or an order pursuant to section 515(g)(1) or 515(g)(2)(C) [21 USCS § 360e(g)(1), (2)(C) ].
 
 
 30
 The parties agree that the relevant portion of section 360g(a)(4) pertains to the promulgation of a regulation under either: (i) section 360e(b)(3) requiring the device to have an approved PMA; or (ii) section 360e(b)(4) amending or revoking a regulation promulgated under section 360e(b)(3).
 
 
 31
 Petitioners argue that this Court has jurisdiction to review the NAFR because it is a "final rule" or regulation under the Administrative Procedure Act ("APA"). Respondents claim that the NAFR is not a regulation or "final rule," but an interpretation of an existing regulation, and therefore this Court lacks jurisdiction. To resolve the question of jurisdiction, we must determine whether the NAFR is a "regulation" within the context of section 360g(a)(4).
 
 
 32
 In general,
 
 
 33
 "[R]egulations," "substantive rules" or "legislative rules" are those which create law, usually implementary to an existing law; whereas interpretive rules are statements as to what the administrative officer thinks the statute or regulation means.
 
 
 34
 Indiana Dep't of Pub. Welfare v. Sullivan, 934 F.2d 853, 856 (7th Cir.1991) (citing Cabais v. Egger, 690 F.2d 234, 238 (D.C.Cir.1982), quoting Gibson Wine Co. v. Snyder, 194 F.2d 329, 331 (D.C.Cir.1952)). Interpretive rules are exempt from the notice and comment requirements under the APA. See 5 U.S.C. § 553(b).
 
 
 35
 The NAFR clearly purports to be an interpretation of a regulation requiring premarket approval pursuant to 21 U.S.C. § 360e(b)(3). The NAFR was not promulgated pursuant to the notice and comment requirements in section 360e(b)(2) as required for the promulgation of a regulation pursuant to section 360e(b)(3). Further, and more importantly, the summary of the NAFR specifically states "[t]he [FDA] is issuing a notice to clarify that replacement heart valve allografts, devices, are subject to a final rule that was issued by FDA on May 13, 1987." (Emphasis added.) The 1987 Regulation, requiring a PMA for replacement heart valves, amended the 1980 Regulation. The 1980 Regulation first identified and classified a "replacement heart valve." The NAFR states the FDA published the NAFR to "clarify" that the 1987 Regulation applies to the petitioners. The NAFR purports to interpret the 1980 and 1987 Regulations which in turn implies that any law created was created by the 1980 and 1987 Regulations. The respondents admit that if the NAFR is an interpretive rule it does not have the force and effect of law. See, e.g., Dyer v. Secretary of Health and Human Services, 889 F.2d 682, 685 (6th Cir.1989).[1]
 
 
 36
 Although the NAFR purports to be an interpretation, it may amount to a regulation if it is not a permissible interpretation of the 1980 and 1987 Regulations. The Supreme Court has stated:
 
 
 37
 When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter.... If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute.... Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
 
 
 38
 Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984) (footnotes omitted) (emphasis added). An agency's construction of its regulations is granted substantial deference. Lyng v. Payne, 476 U.S. 926, 939, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986). Further, an agency's interpretation of its regulation will be upheld " 'unless it is plainly erroneous or inconsistent with the regulation.' " Wisconsin Electric Power Co. v. Reilly, 893 F.2d 901, 907 (7th Cir.1990) (citing Udall v. Tallman, 380 U.S. 1, 16-17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)).
 
 
 39
 In construing a statute, courts first examine its language. United States v. Turkette, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981); Smith v. Bowen, 815 F.2d 1152, 1154 (7th Cir.1987). "The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' " United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (quoting, in part, Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)). "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979).
 
 
 40
 In conjunction with the requirements of the FDC Act, the FDA promulgated the 1980 Regulation which classified "replacement heart valves" as a class III device. Petitioners contend that a heart valve allograft is not a "device." This Court, as reinforced by the Supreme Court, has allowed liberal construction of the FDC Act consistent with its purpose of protecting the public health. United States v. 25 Cases, More or Less, of an Article of Device, 942 F.2d 1179, 1183 (7th Cir.1991). "The FDA has consistently interpreted 'device' in a very expansive manner." Id. at 1182.
 
 
 41
 Congress has provided a detailed definition of "device" at 21 U.S.C. § 321(h) to include an "implant." At issue is whether heart valve allografts are "implants." We are analyzing the term "implant" within the medical context, because our concern is with the provisions of the FDC Act which regulate medical devices. "Implant" is defined as "an object or material, such as an alloplastic or radioactive material or tissue, partially or totally inserted or grafted into the body for prosthetic, therapeutic, diagnostic, or experimental purposes." Dorland's Illustrated Medical Dictionary 824 (27th ed. 1988) (hereinafter "Dorland's "). Further, the act of implanting, or "implantation," is stated as:
 
 
 42
 2. the insertion of an organ or tissue, such as skin, nerve, or tendon, in a new site in the body. 3. the insertion or grafting into the body of biological, living, inert, or radioactive material.
 
 
 43
 Id. Heart valve allografts can reasonably be construed to be implants within these definitions. Petitioners argue that the definition of "device" was intended only to include man-made or artificial "implants." However, the ordinary meaning of "implant" does not support this argument. Further, a heart valve allograft is tissue which undergoes a cryopreservation process so that it has a considerable shelf life. See Summary Minutes of Circulatory System Devices Panel Meeting, August 20-21, 1990, Cert.Rec. 000550 (documented shelf life up to two years and anticipated shelf life of a minimum of five years). Accordingly, heart valve allografts appear to be artificial "implants." We find that the FDA's interpretation of the statutory definition of "device" is permissible.
 
 
 44
 Further, petitioners contend that the definition of replacement heart valve in the 1980 Regulation does not include heart valve allografts, because they are not "biologic valves." A "replacement heart valve" is defined as:[A] device intended to perform the function of any of the heart's natural valves. This device includes valves constructed of prosthetic materials, biologic valves (e.g., porcine valves), or valves constructed of a combination of prosthetic and biologic materials.
 
 
 45
 21 C.F.R. § 870.3925(a) (emphasis added). The same rules of construction apply to administrative rules as to statutes. Rucker v. Wabash R.R. Co., 418 F.2d 146, 149 (7th Cir.1969); see Chicago Transit Authority v. Adams, 607 F.2d 1284, 1289 (7th Cir.1979), cert. denied, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). "Biologic" relates to "biology," which is "the science that deals with the phenomena of life and living organisms in general." Dorland's, supra, at 207.
 
 
 46
 The definition of "replacement heart valve" clearly encompasses matters relating to human organisms. Petitioners claim that "biologic valves" only refer to animal valves and not human valves primarily because the definition lists animal valves as an example of "biologic valves." The list and example contained in the definition are clearly not intended to be all inclusive. A reasonable inference cannot be drawn that the regulation sought to exclude human heart valve allografts particularly when such allografts have been in use for almost thirty years. Accordingly, the FDA's interpretation of its regulation is consistent with its regulation.
 
 
 47
 We conclude that the NAFR is a permissible interpretation of the 1980 and 1987 Regulations. Accordingly, the NAFR is an interpretive rule not subject to appellate review under 21 U.S.C. § 360g(a)(4).[2]
 
 
 48
 Similarly, we find that the NAFR is also not a regulation under section 360e(b)(4) amending or revoking a regulation promulgated under section 360e(b)(3). The NAFR simply interprets the 1980 and 1987 Regulations to apply to heart valve allografts. The NAFR does not change or revoke the original regulations.
 
 CONCLUSION
 
 49
 Because the NAFR is not a regulation under either section 360e(b)(3) requiring the device to have premarket approval or section 360e(b)(4) amending or revoking a regulation promulgated under section 360e(b)(3), we are without jurisdiction under section 360g(a)(4) to rule upon the petition of the six not-for-profit heart valve allograft processors.
 
 
 50
 The Petition for Review is hereby DISMISSED.
 
 
 
 *
 The Honorable John C. Shabaz, of the Western District of Wisconsin, is sitting by designation
 
 
 [1]
 The NAFR gives an "effective date." Petitioners claim that a change in the effective date of a regulation is a substantive rule which requires notice and comment. They rely on Levesque v. Block, 723 F.2d 175 (1st Cir.1983). Levesque can be distinguished from this case
 Levesque addressed the Omnibus Budget Reconciliation Act of 1981 which signed certain changes to the Food Stamp Program into law. This included a change in the definition of "household." These amendments were to be made effective and implemented as prescribed by the Secretary of Agriculture and in accordance with the notice and comment procedures of the APA. The Secretary then published "interim rules" to take effect immediately without notice and comment principally to save costs. Plaintiffs brought a class action to enjoin enforcement of the new definition. The court concluded that the rule was substantive in light of the entire situation.
 By contrast, the NAFR purports solely to interpret a prior rule to apply to petitioners. The NAFR makes no changes in the 1980 and 1987 Regulations. If the NAFR is an interpretive rule then the only possible change is that the NAFR states an "effective date." However, the FDA admits that as an interpretive rule the NAFR does not have the force and effect of law and actually has no effective date as such. Rather, the FDA claims that in exercising its discretion, it will not take any enforcement action until at least the "effective date."
 
 
 [2]
 In reliance on law from the District of Columbia Circuit, petitioners also briefly argue that even if the NAFR is not a final rule, this Court has jurisdiction to review the 1987 Regulation although the statutory time limit for review has expired
 First, petitioners claim that they were not reasonably placed on notice of the content of the 1987 Regulation. See Raton Gas Transmission Co. v. F.E.R.C., 852 F.2d 612, 615 (D.C.Cir.1988). Second, they allege that the 1987 regulation remained clearly unripe for review during the statutory review period, or 30 days of its promulgation. See id. However, the District of Columbia has only granted such review in exceptional circumstances. Id. Petitioners provide no convincing justification.