942 F.2d 1179
 UNITED STATES of America, Plaintiff-Appellee,
v.
25 CASES, MORE OR LESS, OF AN ARTICLE OF DEVICE, Each Case
Containing 50 Sensor Pads in Individual Plastic Bags with
Instructions, Labeled in Part "Sensor Pad for Breast
Self-Examination", Defendant.
Appeal of INVENTIVE PRODUCTS, INCORPORATED, Claimant-Appellant.
 No. 90-2599.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 25, 1991.
Decided Sept. 10, 1991.
 
 Heidi A. Garland (argued), Department of Justice Consumer Litigation, Washington, D.C., Kay Cook Food & Drug Admin., Rockville, Md., for plaintiff-appellee.
 Dennis M. Gronek (argued), Gronek & Armstrong, Chicago, Ill., for defendant.
 Philip L. Bateman, Samuels, Miller, Schroeder, Jackson & Sly, Decatur, Ill., for claimant-appellant.
 Before CUDAHY, COFFEY and EASTERBROOK, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 In this case we are called on to interpret the word "device" as used in the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321(h)(2) (1988) (the Act). The government brought this action to seize the appellant's inventory, believing it to consist of adulterated devices in interstate commerce. Id. § 331. The district court granted summary judgment for the government.
 
 
 2
 The Act delineates three classes of devices intended for human use based upon the degree of FDA oversight each class requires. Id. § 360c. Devices are placed in the third classification if "insufficient information exists to determine" which of the first two classifications apply. Id. § 360c(a)(1)(C). The Act requires that the distributors of class III devices apply for premarket approval under section 360e, a rather involved process. With certain qualifications not relevant here, a device is automatically classified as a class III device if it was introduced after May 28, 1976. Id. § 360c(f). In turn, class III devices as to which application for pre-market approval is denied or incomplete are deemed adulterated. Id. § 351(f)(1)(A).
 
 
 3
 In the mid-1980s, Earl Wright developed a product which he believed would aid women in conducting self-examinations for the early detection of breast cancer. This product, descriptively named the "Sensor Pad," consists of a flat, circular latex bag filled with a layer of silicone lubricant. It is intended to be placed over the breast during self-examinations to improve the woman's ability to feel abnormalities beneath the skin. Wright and his associates believed the Pad was not a "device" under the Act. To receive a binding confirmation of this belief, their company, Inventive Products, Inc., submitted a pre-market notification to the FDA on April 24, 1985, informing the agency of its plans to market the Sensor Pad. On June 18, 1986, the FDA officially informed Inventive Products that the agency considered the Pad a class III device requiring pre-market approval.
 
 
 4
 The company never petitioned the agency for reclassification under section 360c(e), but in September 1989 it did submit an application for pre-market approval. The FDA informed the defendant in December 1989 that the application did not contain information demonstrating that the Sensor Pad was safe and effective for its intended use. Nevertheless, an inspection of Inventive Products' facility in January 1990 revealed that the company had already been distributing the Pad. The FDA brought the present action to seize the Sensor Pads in inventory. The district court found no material questions of fact in dispute, and awarded summary judgment for the government.
 
 
 5
 Inventive Products now concedes that its product is "new" within the meaning of section 360c(f): it was first introduced after May 28, 1976, and it does not meet any of the exceptions set out in the statute. The appellant therefore admits that, if the Sensor Pad must be classified at all, it belongs in class III. Its only argument on appeal is that the Pad need not be classified because it is not a "device" as understood by the Act.
 
 
 6
 According to the Act, the term device "means an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is ... (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease...." 21 U.S.C. § 321(h). The FDA contends that Congress' use of the word "diagnosis" brings the Sensor Pad within the meaning of device. Although agreeing that its Pad aids in the detection and screening of breast cancer, Inventive Products nevertheless argues that the word diagnosis does not encompass the function of the Sensor Pad. Diagnosis, the appellant suggests, includes only examinations to "determine the nature and circumstances of a diseased condition." Appellant's Br. at 20. Because the Sensor Pad merely helps the woman in detecting abnormalities that could be symptoms of a disease, strictly speaking it is used before actual diagnosis.
 
 
 7
 The distinction appellant attempts to draw between screening and diagnosis is an untenable one. In its opening brief, Inventive Products appears to argue that diagnosis occurs only at the last step in the process of discovering a disease, that step which ultimately determines the nature and circumstances of a diseased condition. Thus, because the Sensor Pad only detects irregularities which may or may not be cancerous growths, it does not diagnose the disease. Indeed appellant agrees with one of its expert physicians, who averred that "[b]iopsy is the only means of diagnosing breast cancer." Appellant's Br., App. at 15a (declaration of J.G. Katterhagen, M.D.); see also Appellant's Br. at 14. By proposing that medical inquiries change from screening to diagnosis only at the final determination, the appellant's theory would apparently exclude even a mammography unit from being classified as diagnostic, because it too cannot confirm the presence of cancer. Appellant's expert reinforces that formulation. See id. ("Techniques used by physicians to observe and examine a patient for indications that a biopsy may be necessary include mammography and the manual palpation of the breast by the physician. These observation and examination techniques are referred to as 'screening' techniques....").
 
 
 8
 But appellant is not wholly committed to taking the extreme position its argument (and its expert) suggest. In a footnote, Inventive Products concedes that "[m]ammography units are used in the process of diagnosis and treatment of breast cancer." Appellant's Br. at 19 n. 1. Appellant's screening/diagnosing distinction now becomes indistinct, for how can a mammography unit be incapable of ultimately determining the disease yet still be used in "diagnosis"? Given this inconsistency, Inventive Products seems almost to be arguing that use by the physician rather than the patient is the hallmark of a diagnostic tool.
 
 
 9
 The obscurity of the line appellant would draw between diagnosis and screening--as well as its disagreement with its own expert on the subject--well illustrates the arbitrariness of the line-drawing. Pursuing this fruitless inquiry is irrelevant in any event since we believe Congress had no such screening/diagnosing distinction in mind when it wrote section 321(h).
 
 
 10
 The current description of "device" in the Act was adopted essentially in the original version of the Federal Food, Drug and Cosmetic Act, 52 Stat. 1040 (1938), the development of which is discussed in United States v. Article of Drug * * * Bacto-Unidisk, 394 U.S. 784, 793-98, 89 S.Ct. 1410, 1415-18, 22 L.Ed.2d 726 (1969). The bill emerged from committee in the Senate with several amendments, one of which proposed broadening the definition of "device" to include tools used in diagnosis of disease.[1] At that time one senator, with the voiced approval of the bill's sponsor, summarized the amendment on the floor of the chamber: "the word 'diagnosis' merely adds to their uses, namely, their use in looking into a situation prior to the time when the cure or mitigation shall begin." 79 Cong.Rec. 4843 (1935) (statement of Sen. Barkley), 3 Legislative History 799. Another senator meanwhile offered the view that weight scales used during the diagnosis of a patient would come within the bill's regulation. Id. (statement of Sen. Clark).
 
 
 11
 Moreover, even if Congress' intentions with regard to the scope of "diagnosis" were not clear from its debate, the FDA's position in this matter would still prevail. It would be entirely plausible to suggest that Congress intended the FDA to decide for itself which devices are used for diagnosing disease. One senator opined on the floor of the Senate that "[t]he language [of the bill] is broad enough to cover any device of which the Food and Drug Bureau of the Agricultural Department chooses to take jurisdiction." Id. at 4841, 4 Legislative History 797. Such a delegation to the FDA would require a court to give considerable deference to the agency's decision. See, e.g., INS v. Wang, 450 U.S. 139, 144-45, 101 S.Ct. 1027, 1031, 67 L.Ed.2d 123 (1981); E.I. du Pont de Nemours & Co. v. Collins, 432 U.S. 46, 53-54, 57, 97 S.Ct. 2229, 2233-34, 2235, 53 L.Ed.2d 100 (1977). See generally Levin, Identifying Questions of Law in Administrative Law, 74 Geo.L.J. 1, 9-13 (1985); Monaghan, Marbury and the Administrative State, 83 Colum.L.Rev. 1, 25-31 (1983).
 
 
 12
 Second, even had Congress never considered the question before us, we might allow the FDA room to decide the question itself. Courts often will defer to an agency's reasonable interpretation of an ambiguous provision within the agency's own organic statute. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). The FDA has consistently interpreted "device" in a very expansive manner. See, e.g., United States v. Article of Device, 731 F.2d 1253 (7th Cir.), cert. denied, 469 U.S. 882, 105 S.Ct. 249, 83 L.Ed.2d 186 (1984) (radiation detector used to locate problem areas of body on which chiropractors will concentrate qualifies as device); United States v. Articles of Device, etc., 481 F.2d 434, 437 (10th Cir.1973) (galvanometer used to indicate diseased state by measuring electric current running through patient's body constitutes device). Deference pursuant to Chevron may not be appropriate in an interpretation involving the very scope of an agency's authority,[2] but appellant has not tendered any argument that the meaning of "diagnosis" presents such a question. Consequently, to the extent argued here, Chevron also supports deferral to the agency's conclusion.
 
 
 13
 Our approach in this case has been further reinforced by the Supreme Court, which reminded litigants that "[r]emedial legislation such as the Food, Drug and Cosmetic Act is to be given a liberal construction consistent with the Act's overriding purpose to protect the public health...." Bacto-Unidisk, 394 U.S. at 798, 89 S.Ct. at 1418. A broad definition of "diagnosis" allows for greater authority in the agency to oversee developments in health care, and thus it may better protect the public health.
 
 
 14
 For each of the above reasons, the district court was correct to grant the government's motion for summary judgment in this case. The judgment is therefore AFFIRMED.
 
 
 
 [1]
 At that point in the bill's progress, a device was still considered merely one type of "drug" subject to regulation. S. 2800, S.Rep. No. 493, 73d Cong., 2d Sess. (1934), reprinted in 1 U.S. Dept. of Health, Education, and Welfare, A Legislative History of the Federal Food, Drug and Cosmetic Act and Its Amendments 597, 598 (1979) (hereinafter Legislative History ). A later amendment distinguished devices, making them independently subject to regulation. 79 Cong.Rec. at 8351 (1935), 4 Legislative History 180. See generally Bacto-Unidisk, 394 U.S. at 793-98, 89 S.Ct. at 1415-18
 
 
 [2]
 Compare Mississippi Power & Light Co. v. Mississippi ex rel. Moore, 487 U.S. 354, 386-87, 108 S.Ct. 2428, 2446-47, 101 L.Ed.2d 322 (1988) (Brennan, J., dissenting) and New York Shipping Ass'n v. Federal Maritime Comm'n, 854 F.2d 1338, 1362-63 (D.C.Cir.1988), cert. denied, 488 U.S. 1041, 109 S.Ct. 866, 102 L.Ed.2d 990 (1989) with Dole v. United Steelworkers of America, 494 U.S. 26, 110 S.Ct. 929, 944, 108 L.Ed.2d 23 (1990) (White, J., dissenting) and Mississippi Power & Light, 487 U.S. at 380, 108 S.Ct. at 2443 (Scalia, J., concurring). Cf. EEOC v. Arabian American Oil Co., --- U.S. ----, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (refusing to defer to EEOC in question of extraterritorial application of Title VII). See generally Sunstein, Constitutionalism After the New Deal, 101 Harv.L.Rev. 421, 467-68 (1987)