**CLINICAL REFERENCE LABORATORY, INC.,**
**Plaintiff,**

v.

**Louis W. SULLIVAN, M.D., Secretary of Health, David A. Kessler, M.D., Commissioner, U.S. Food and Drug Administration, and U.S. Food and Drug Administration, Defendants.**

**UNITED STATES, Plaintiff,**

v.

**AN UNDETERMINED NUMBER OF SPECIMEN CONTAINERS, CONSENT FORMS, AMERICAN RED CROSS BROCHURES, INSTRUCTION SHEETS, etc., Defendants.**

Civ. A. Nos. 91–2313–L, 91–2412–L.

United States District Court,
D. Kansas.

April 10, 1992.

Overland Park, Kan., Donald E. Segal, Thomas Hylden, Micha Barach, Ann K. Pollock, and Bruce F. Mackler, Baker & Hostettler, Washington, D.C., for plaintiff.

Robert A. Olsen, Office of U.S. Atty., Kansas City, Kan. and Steven A. Keller, Office of Consumer Litigation, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

At issue in these cases is the scope of the regulatory authority of the United States Food and Drug Administration (FDA) over medical articles. This dispute arose when Clinical Reference Laboratory, Inc. (CRL), a Kansas corporation that performs in-house laboratory testing for insurance risk assessment purposes, began using a risk assessment protocol for the Human Immunodeficiency Virus Type–1 (HIV–1)[1] using saliva and urine specimens. After learning of CRL's testing, the FDA issued a letter of warning, stating that it considered such conduct to violate the Federal Food, Drug, and Cosmetic Act (the FDCA or the Act), 21 U.S.C. § 301 *et seq.* CRL then filed an action for declaratory and injunctive relief against the FDA, Civil Action No. 91–2313, invoking jurisdiction under 28 U.S.C. §§ 1331, 1361, and 5 U.S.C. § 702. CRL sought an order from the court that its conduct was beyond the FDA's regulatory control.

On October 29, 1991, the United States initiated a seizure action against CRL, Civil Action No. 91–2412, in which it seized various items used by CRL in its HIV–1 testing procedures. On November 8, 1991, pursuant to 21 U.S.C. § 334(b) and Rule C(6) of the Supplemental Rules for Certain Admiralty and Maritime Claims, CRL filed a claim to the items seized. Currently before the court are motions in both cases, including in 91–2313: CRL's motion for partial summary judgment (Doc. # 15); CRL's motion to consolidate (Doc. # 29); and the FDA's motion to dismiss (Doc. # 20). Be-

John C. Monica, Shook, Hardy & Bacon, Kansas City, Mo., Ronald L. Bodinson, Timothy M. O'Brien, Shook, Hardy & Bacon,

---

1. Infection with the HIV–1 virus may eventually lead to the acquisition of Acquired Immunodeficiency Syndrome (AIDS).

fore the court in 91–2412 are CRL's motion to consolidate (Doc. # 6), CRL's motion for summary judgment (Doc. # 8), and CRL's motion to quash the seizure (Doc. # 10).

The central issues in these cases are raised in CRL's motion for summary judgment in Civil Action No. 91–2412. By agreement of the parties at oral argument, these matters will be treated as being submitted for resolution on cross motions for summary judgment. For the reasons set forth below, the court finds that the FDA's regulatory actions were within its jurisdiction and that it is entitled to summary judgment.

## I. FACTUAL BACKGROUND

The court finds that the following facts are uncontroverted for the purposes of the motions for summary judgment. In the spring of 1989 and winter of 1990 CRL developed insurance risk assessment protocols [2] to detect the presence of antibodies to the HIV–1 virus in human urine and saliva specimens. These protocols utilize, in part, a commercially available test system for HIV–1 which has been approved by the FDA. CRL's protocols and reagents, however, have not been submitted to the FDA for review.

CRL offers its urine testing service under the trade name InsurScreen [tm] and its saliva testing service under the trade name InsurScreen Plus [tm] to the insurance industry. Insurance companies use these services to screen applicants for life insurance. Urine or saliva is collected from the life insurance applicant by a paramedical company that is hired by the insurance company. As a part of its service, CRL provides specimen collection containers to the paramedical company for the purpose of obtaining the specimens on which the risk assess-

ment tests are to be performed. For its InsurScreen [tm] service, CRL sends the paramedical company a package containing a urine collection container, a plastic cup with a strip thermometer, two plastic shipping bottles, a sealable pouch describing chain of custody procedures, packaging materials, and an instruction sheet containing CRL's name, address, and telephone number. For InsurScreen Plus, [tm] CRL provides a package consisting of a general viral specimen collection product, a sealable pouch describing chain of custody procedures, and an instruction sheet. CRL also provides informed consent forms to be signed by the insurance applicants to gain consent to obtain the specimens. The consent forms advise the applicants that the testing is done for risk assessment purposes and not to render a medical diagnosis.

The paramedical company sends the specimens it obtains to CRL's laboratory in Kansas for testing. According to CRL, if the test results are normal, CRL reports to the insurance company that a "non-reactive" result was obtained. If, however, the results are other than normal, CRL reports to the insurance company that an "inconclusive" result was obtained. The insurance company is then able to request that the applicant submit to a blood test for further risk assessment analysis. CRL contends that it does not report any results directly to the insurance applicants,[3] nor does it indicate to the insurance company that an applicant does or does not have any disease.

FDA investigators inspected CRL's facilities on June 28, 1991. On July 10, 1991, FDA issued a "Talk Paper,"[4] in which the FDA announced its view that the promotion of AIDS antibody tests for use with

---

**2.** CRL defines the term "protocol" as "a set of plans and procedures (a test method) which describes the type of patient specimen, equipment, and reagents needed to perform a test, the procedures for conducting the test, and how the test result is to be interpreted and reported." CRL's Memorandum in Support of Summary Judgment at 4–5.

**3.** The FDA notes, however, that many states require insurance companies to provide insur-

ance applicants with the reason that they were denied coverage. *See, e.g.,* K.S.A. § 40–2,112 (Supp.1991). Thus, applicants can sometimes obtain test results even if CRL does not disclose them.

**4.** A "Talk Paper" is a newsletter sent to FDA personnel to assist them in answering questions from the press.

bodily fluids other than blood, dried blood spots, plasma, or serum violates the FDCA. The Talk Paper announced that specimen collection devices that are used for such testing require premarket approval by the FDA. On August 15, 1991, the FDA demanded that CRL immediately cease its AIDS antibody testing using the urine and saliva specimen collection devices. CRL filed its action for declaratory and injunctive relief on August 20, 1991, in Civil Action No. 91–2313. On October 1, 1991, CRL filed a motion for partial summary judgment in that case, asking for a declaration that (1) the jurisdiction of the FDA and the FDCA do not extend to CRL's testing services used solely for risk assessment purposes by the insurance industry, and (2) that CRL's specimen collection devices are not medical devices within the meaning of the FDCA.

The government filed its complaint for forfeiture and seizure, Civil Action No. 91–2412, on October 29, in which it alleged that there were articles of device within CRL's possession which were "adulterated within the meaning of the Act, 21 U.S.C. 351(f)(1)(B), in that they are Class III devices within the meaning of 21 U.S.C. 360c(f) and they are required to have in effect an approved application for premarket approval, and no such application has been approved." Complaint for Forfeiture ¶ 4. On the same day a United States Marshall seized items named in the complaint and found at CRL's offices, including American Red Cross brochures, specimen collection cups and kits, consent forms, and instruction sheets.

## II. PENDING MOTIONS IN 91–2313

■ Defendants in Civil Action No. 91–2313, Sullivan, Kessler, and the FDA (hereinafter collectively referred to as the FDA), move to dismiss CRL's declaratory and injunctive relief action pursuant to Fed. R.Civ.P. 12(b)(1) for lack of jurisdiction. In assessing a motion to dismiss the court accepts allegations in the complaint as true to the extent that they are uncontroverted by submitted affidavits. *Behagen v. Amateur Basketball Ass'n*, 744 F.2d 731, 733 (10th Cir.1984), *cert. denied*, 471 U.S. 1010, 105 S.Ct. 1879, 85 L.Ed.2d 171 (1985). The plaintiff is entitled to the benefit of any factual doubt. *Ammon v. Kaplow*, 468 F.Supp. 1304, 1309 (D.Kan.1979).

The FDA makes three arguments in support of its motion to dismiss: (1) the matter is not ripe for determination; (2) CRL failed to exhaust its administrative remedies; and (3) this court lacks jurisdiction to interfere with the FDA's enforcement actions under the FDCA. Because the court finds that CRL's action was filed prematurely, this motion will be granted.[5]

The FDA argues that CRL's preemptive suit was improperly filed because there has been no final agency action regarding CRL's specimen collection containers, making CRL's action unripe. The Tenth Circuit has determined that there are four factors to consider in determining whether a matter is ripe for judicial determination: (1) whether the challenged agency action is "final action" under section 10 of the Administrative Procedure Act, 5 U.S.C. § 704; (2) whether the issues presented are purely legal; (3) whether the challenged action has or will have a direct and immediate impact on the party seeking review; and (4) whether resolution of the issue will foster, rather than impede, effective enforcement and administration by the agency. *C.S.G. Exploration Co. v. F.E.R.C.*, 930 F.2d 1477, 1482–83 (10th Cir.1991). The central issue in this motion is whether there has been final agency action by the FDA. The court concludes that there has not.

CRL contends that the regulatory letter sent by the FDA demanding that CRL cease its testing activities, and the statement of the FDA's position in the Talk Paper, amounted to final agency action. Regulatory letters such as the one sent to CRL, however, do not amount to final agency action. *Biotics Research Corp. v. Heckler*, 710 F.2d 1375, 1377–78 (9th Cir.

---

**5.** The court bases its ruling on the FDA's ripeness argument, and thus need not address the FDA's remaining contentions.

1983). *But see Ciba–Geigy Corp. v. U.S. Environmental Protection Agency,* 801 F.2d 430 (D.C.Cir.1986) (letter from E.P.A. official in response to request for clarification of agency's position was final action). Such letters do not bind the agency to the views expressed in them. Moreover, the letter sent to CRL stated that the FDA was continuing to investigate the matter, indicating that the agency had not yet reached an ultimate conclusion. Furthermore, statements by agency officials, such as those contained in the Talk Paper, do not amount to final agency action. *Schering Corp. v. Heckler,* 779 F.2d 683, 686 n. 18 (D.C.Cir.1985) (statements by FDA officials held not to be final agency action); 21 C.F.R. § 10.85(k) (1991) (statements by an FDA employee are informal communication that do not represent the formal position of the FDA and do not obligate the FDA to the views expressed). Moreover, the Talk Papers to which CRL refers expressly declared that the positions announced were subject to change.[6]

CRL also contends that the subsequent seizure action instituted by the FDA amounts to final agency action. The court disagrees. Such actions are not final agency determinations that the articles seized violate provisions of the FDCA; they are merely determinations that there is reason to aver that a violation has occurred. The judicial investigation and resolution initiated by a seizure action, together with any ongoing administrative investigation by the FDA, are only part of the process through which the FDA reaches a final determination regarding the challenged articles. Such seizures, especially when based upon agency positions that are themselves not final, do not constitute final action. *See,*

*e.g., Schering,* 779 F.2d at 686 n. 18 (seizure action against new drug not final agency action); *Dietary Supplement Coalition, Inc. v. Sullivan,* No. 91–126–RE, slip op. at 7–10, 1991 WL 341447 (D.Ore. July 8, 1991), *appeal docketed,* No. 91–36013 (9th Cir. Sept. 23, 1991).

The court is also concerned that CRL failed to exhaust its administrative remedies before filing suit. According to the FDA, CRL could have filed a "citizen's petition" under 21 C.F.R. § 10.25(a) (1991), asking for a formal determination of the status of its specimen collection containers. CRL also could have petitioned the FDA for an order classifying its specimen collection containers in a category that would not require the premarket approval application that the FDA claims was required and not obtained in this case. 21 U.S.C. § 360c(f)(2) (1988). The FDA contends that CRL also could have used the FDA's internal review procedure to obtain a review of the position expressed in the compliance letter sent by the FDA. 21 C.F.R. § 10.75 (1991).

Parties should not be allowed to file preemptive suits for declaratory or injunctive relief in order to avoid what they perceive as unfavorable agency positions before the agency has had an opportunity to reach a final determination on the merits of the issue. Such actions defeat the purpose of allowing administrative agencies to exercise their delegated authority in areas in which their expertise exceeds that of the judiciary. For these reasons, the court finds that CRL's claim for injunctive or declaratory relief is not ripe and grants the FDA's motion to dismiss Civil Action No. 91–2313.[7]

---

**6.** CRL also argues in its motion for summary judgment in 91–2412 that the regulatory letter and Talk Papers constitute "rules" that were established by the FDA without complying with the notice and comment requirements of the Administrative Procedure Act (APA). This argument is wholly without merit. These actions, which did not amount to final agency action, also did not constitute a "rule" within the meaning of the APA. The decision to initiate enforcement proceedings against CRL amounted only to a determination that the containers were subject to regulation under the FDCA, a determina-

tion that the FDA was entitled to make without resort to judicial or administrative hearings. *See CIBA Corp. v. Weinberger,* 412 U.S. 640, 643–44, 93 S.Ct. 2495, 2498, 37 L.Ed.2d 230 (1973); *United States v. Alcon Labs.,* 636 F.2d 876, 886 (1st Cir.), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3005, 69 L.Ed.2d 388 (1981) ("[T]here is no statutory hearing requirement for FDA decisions to initiate seizure or injunction actions.").

**7.** In light of this determination, CRL's remaining motions to consolidate and for partial sum-

## III. PENDING MOTIONS IN 91–2412

Two motions remain for adjudication in the government's seizure action: CRL's motion to quash the arrest and seizure, and the parties' cross motions for summary judgment. Because most of the substantive issues upon which resolution of this dispute turns are raised in the summary judgment motions, the court will focus its attention there.

### A. Motion to Quash

■ CRL seeks to have the government's seizure quashed because it was overly broad. According to CRL, many of the items seized were capable of being used for purposes other than HIV–1 testing and were therefore not reasonably related to the government's complaint. In addition, CRL argues that several of the items seized were not "adulterated" within the meaning of the FDCA, and hence were not related to the complaint.

The court is somewhat troubled by the scope and volume of the items seized by the government and the FDA's refusal to agree to the token seizure offered by CRL, which would have placed the dispute in a justiciable posture before the court while not hindering CRL's ability to conduct its business. Yet, the purpose of the government's action was to prevent CRL from performing its HIV–1 testing with alleged medical devices that had not been approved by the FDA. Because the specimen collection containers are capable of many uses, the government seized a large quantity of those items in order to effectuate its purpose. Moreover, the court believes that the most appropriate way to evaluate the scope of the seizure in this case, especially CRL's claim that some items were not adulterated, is on the motions for summary judgment. *See United States v. An Article of Device ... "Theramatic,"* 715 F.2d 1339, 1342 (9th Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1281, 79 L.Ed.2d 685 (1984) (seizure may be challenged through motion to quash, motion to dismiss, or motion for summary judgment). The motion to quash is therefore denied, and the court turns to the motions for summary judgment.

### B. Motions for Summary Judgment

Both the FDA and CRL seek in their motions for summary judgment a determination of whether the FDA has the statutory authority to proceed against the items seized from CRL. This requires determining whether the specimen collection containers and other items seized are "devices" so as to be subject to regulation under the FDCA. CRL contends that these items are not devices and that the FDA has no jurisdiction to regulate CRL's use of them in its HIV–1 testing. The FDA argues that they are devices within the meaning of the statute and are therefore properly regulable.

When considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the nonmoving party. *Barber v. General Elec. Co.,* 648 F.2d 1272, 1276 n. 1 (10th Cir. 1981). A moving party who bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Maughan v. S.W. Servicing, Inc.,* 758 F.2d 1381, 1387 (10th Cir.1985). If the moving party does not bear the burden of proof at trial, it must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

Once the movant meets these requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The nonmovant may not merely rest on the pleadings to meet this burden. *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511; *Tersiner v. Un-*

mary judgment in 91–2313, as well as its motion to consolidate in 91–2412, are moot.

*ion Pacific R.R.*, 740 F.Supp. 1519, 1522–23 (D.Kan.1990).

1. Statutory Framework

■ The FDCA defines a "device" as: an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is— ... (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals....

21 U.S.C. § 321(h) (1988). Pursuant to the Medical Device Amendments Act of 1976, Pub.L. No. 94–295, 90 Stat. 539, devices are classified into three categories, based upon the degree of regulation necessary to ensure their safety and effectiveness. 21 U.S.C. § 360c(a). Any device which was not introduced for commercial distribution into interstate commerce before May 28, 1976, is classified in Class III unless it falls within one of several exceptions. 21 U.S.C. § 360c(f). Promoters of such Class III devices are required to submit an application for premarket approval to the FDA before they are introduced into interstate commerce. 21 U.S.C. § 360e(a). A Class III device that is introduced into interstate commerce without such an application in effect is considered to be an adulterated device under 21 U.S.C. § 351(f).

The central dispute in this case arises out of the phrase "intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease." CRL contends that its specimen collection containers are not devices because they are intended solely for use in the gathering of information for insurance risk assessment purposes, not

for any medical purpose. CRL defines the term "diagnosis" as connoting a relationship to medical treatment. Because CRL's instruction forms specifically declare that its saliva and urine testing protocols are not intended to be used for medical diagnosis, it contends that these containers cannot be devices within the meaning of the statute. Furthermore, CRL argues that the real target of the FDA's regulation in this case is not the containers themselves, but CRL's lab testing procedures. CRL contends that the FDA has no authority to regulate testing procedures because such procedures are regulated by the Health Care Financing Administration (HCFA) under the Clinical Laboratories Improvement Act (CLIA), 42 U.S.C. § 263a (1988). Essentially, CRL argues that CLIA preempts FDA regulation of laboratory protocols.

The FDA argues, on the other hand, that the specimen collection containers are used for diagnosing the presence of HIV–1, despite CRL's disclaimer to the contrary. The FDA suggests that, regardless of CRL's objective intent,[8] the collection devices are actually used in the process of medically diagnosing the presence of HIV–1. The FDA defines the term "diagnosis" according to the ordinary dictionary meaning of that word, which includes "an investigation or analysis of the cause or nature of a condition." Webster's Third New International Dictionary (1981). The FDA contends that, despite CRL's belief that its HIV–1 test results are used only for internal business decisions by insurance companies, life insurance applicants may correctly or incorrectly regard the test results as an indication of whether they have AIDS. As the FDA points out, false negative results that are somehow communicated to an applicant could be tragic.[9] If an applicant who is eventually given insurance is

**8.** Whether a product is a device largely depends upon its intended use, which in turn depends upon the objective intent of the persons responsible for its labeling. 21 C.F.R. § 801.4 (1991); *United States v. 22 Rectangular or Cylindrical Devices,* 714 F.Supp. 1159, 1165 (D.Utah 1989). However, intended use may also be shown by the product's actual use. *22 Rectangular Devices,* 714 F.Supp. at 1165; Senate Comm. on Labor and Public Welfare, Medical Device Amendments of 1976, S.Rep. No. 33, 94th Cong.,

1st Sess. 14 (1975), U.S.Code Cong. & Admin.News, pp. 1070, 1083. ("[T]he potential for harm inherent in a certain device may not be determined solely on the basis of its intended use.").

**9.** As the FDA also points out, a false positive result, although less likely to be relied upon to the applicant's detriment, could also have unintended, but extremely negative, repercussions.

informed that HIV–1 screening was a part of the application process, the applicant may assume that he or she is not infected. The disclaimers from CRL and the insurance company are likely to be viewed merely as legalistic boilerplate. Such a consequence could lull the applicant into believing that he or she is not infected and that precautions need not be taken or medical treatment obtained.

### 2. Definition of "Diagnosis"

■ The touchstone of the inquiry in this case is the meaning of the term "diagnosis." Although a product's intended use determines whether it is a device, *United States v. 22 Rectangular or Cylindrical Devices,* 714 F.Supp. 1159, 1165 (D.Utah 1989), the parties here agree that these items were intended to be used for collecting urine and saliva to test for the presence of HIV–1 antibodies for insurance risk assessment purposes. The question thus becomes whether this use constitutes a diagnosis.

The FDCA does not define the term "diagnosis." It is relatively clear, however, that a diagnostic purpose implies something different from a therapeutic or treatment purpose. The statute defines a "device" disjunctively, as "intended for use in the diagnosis of disease ... *or* in the cure, mitigation, treatment, or prevention of disease...." 21 U.S.C. § 321(h)(2) (1988) (emphasis added); *see also* 21 C.F.R. § 892.1(c) (1991) (X-ray machines are devices under the Act, whether used for diagnostic purposes *or* therapeutic purposes). The only legislative history relating to the term "diagnosis" indicates that it was meant to imply "looking into a situation prior to the time when the cure or mitigation shall begin." 79 Cong.Rec. 4843 (1935) (statement of Senator Barkley).

The critical issue is whether a product must be intended for use in some way within the medical treatment process in order to be diagnostic and a device. Unfortunately, the cases interpreting this section of the FDCA do not provide a clear answer to this inquiry. For instance, in *United States v. 22 Rectangular or Cylindrical Devices,* 714 F.Supp. 1159 (D.Utah 1989), the court found that a surgical instrument sterilizer was a device subject to FDA regulation, even though the product never came into direct contact with patients. The court held that a product need not be the only agent in the curative process to be a device. *Id.* at 1164. The Seventh Circuit extended the definition of diagnosis a step further in *United States v. 25 Cases, More or Less ... "Sensor Pad,"* 942 F.2d 1179 (7th Cir.1991). The *Sensor Pad* court held that a device designed to be placed over a woman's breast during self-examinations to improve her ability to detect abnormalities was a device within the meaning of the FDCA, even though use of that device was intended only to indicate whether follow-up testing was necessary. *See also generally* Annotation, *What is a "Drug," a "Device," and a "New Drug" Within the Definitions of these Terms in § 201(g)(1), (h), and (p) of the Federal Food, Drug, and Cosmetic Act as Amended,* 3 A.L.R. Fed. 843 (1970 & Supp.1991), and cases cited therein.

Although the *Sensor Pad* and *22 Rectangular Devices* cases found that the products at issue were regulable by the FDA, those cases are factually distinguishable from the instant one. In those cases the products involved were more clearly related to an intended medical purpose than the specimen collection containers in the case at bar. In *Sensor Pad,* for example, the consumer used the product with the express purpose of determining whether medical treatment was needed. Here, however, the products are used with the express purpose of obtaining insurance, and only indirectly, through possible misplaced consumer reliance on the tests as an AIDS/HIV–1 detection procedure, are the products used to determine the need for medical treatment.

The court can find no indication, however, that this distinction makes a difference. No case cited by the parties or discovered by the court draws upon this distinction to hold that a product is not a device. Thus, because the statute itself and the case law interpreting it provide no clear answers, the court must turn to legis-

lative history in attempting to divine the meaning of the term "diagnosis."

The FDCA was enacted in 1938 with the overriding purpose of protecting the public health. The terms "drug" and "device" were originally given parallel definitions in the Act, each deemed to include products intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease. *United States v. An Article of Drug ... Bacto–Unidisk*, 394 U.S. 784, 789–90, 89 S.Ct. 1410, 1414, 22 L.Ed.2d 726 (1969) (tracking the development of the term "device").

In 1945, however, Congress enacted the premarket clearance provisions, which applied at that time only to drugs. *Id.* at 797–98, 89 S.Ct. at 1417–18. In order to allow the FDA to demand premarket approval of items deemed dangerous to the public health, the courts adopted a broad reading of the term "drug," including in that definition many items that today would be considered devices. In *Bacto–Unidisk*, for example, the Supreme Court found that antibiotic sensitivity discs, used as a screening test for determining the proper antibiotic drug to administer, were drugs within the meaning of the statute so as to be subject to FDA regulation. The claimant's primary contention in that case was that Congress did not intend the FDCA to cover articles used so indirectly in the diagnosis, cure, treatment, and mitigation of disease. *Id.* at 792, 89 S.Ct. at 1415. It argued for a strict medical definition of the term "drug." The Court rejected such a definition, holding that "Congress fully intended that the Act's coverage be as broad as its literal language indicates—and equally clearly, broader than any strict medical definition might otherwise allow." *Id.* at 798, 89 S.Ct. at 1418.

Not every court adopted such a broad reading of the term "drug," however. In *United States v. Article of Drug—Ova II*, 414 F.Supp. 660 (D.N.J.1975), *aff'd without opinion*, 535 F.2d 1248 (3d Cir.1976), the court refused to categorize as a "new drug" a kit for *in vitro* pregnancy testing, distinguishing the Supreme Court's decision in *Bacto–Unidisk*. The pregnancy testing kit at issue in that case was remarkably similar in purpose to the product at issue here. It was intended merely to provide information to the consumer, which could be used to determine the need for follow-up testing, but it was not intended to indicate the need for medical treatment. *Id.* at 664 (pregnancy test kit not a test "for the diagnosis of disease," but only intended to provide "academic" information). The court found that the pregnancy test kit was not a "drug" subject to the FDA's new drug approval regulations. The court noted in passing, however, that it had not considered the implications of Senate bill 510, pending at the time, "even though [the bill] would define a 'device' as embracing *in vitro* reagents intended for use in the diagnosis of 'conditions' (i.e., pregnancy), other than disease." *Id.* at 666.

The House passed its version of Senate bill 510 on May 28, 1976, enacting the Medical Device Amendments of 1976, Pub.L. No. 94–295, 90 Stat. 575. Debate regarding these amendments indicated Congress' dissatisfaction with the old method of regulating devices. As the House Report on these amendments noted, the liberal interpretation of the term "drug" adopted by the Supreme Court in *Bacto–Unidisk* to allow FDA jurisdiction over items the House Committee thought properly regulable "has not been entirely successful, however, as illustrated by a recent district court decision in *United States v. An article of drug ... Ova II.*" House Comm. on Interstate and Foreign Commerce, Medical Device Amendments of 1976, H.R.Rep. No. 853, 94th Cong., 2d Sess. 9 (1976) (hereinafter House Report). Indicating its disapproval of the *Ova II* decision and citing the "need for more comprehensive authority to regulate medical devices," Congress amended the definition of "device" and enacted premarket approval provisions for devices. House Report, *supra*, at 9, 14.

The court finds that the legislative history behind the 1976 Medical Device Amendments indicates a congressional intent to allow FDA regulation over products like CRL's specimen collection containers and the pregnancy testing kits in *Ova II*. The

congressional reports also indicate approval of the Supreme Court's method in *Bacto-Unidisk* of broadly defining terms within the FDCA. However, even if the legislative history were not clear, the court finds that it must give broad deference to the FDA's reasonable interpretation of the statutory scheme that it is entrusted to administer. *See Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *accord Downtown Medical Center v. Bowen*, 944 F.2d 756, 768 (10th Cir.1991). Thus, under the FDA's interpretation of the term "diagnosis" in this case, which must be given considerable weight, CRL's specimen collection containers are devices and subject to regulation because they are used in the "investigation ... of the cause or nature of a condition."

3. CLIA Preemption

■ CRL contends that HCFA, through CLIA, 42 U.S.C. § 263a, is the proper body to regulate laboratory testing, which it contends is the real target of the FDA, rather than the specimen collection containers. Under the CLIA definition, a clinical laboratory is a facility that is engaged in the examination of bodily materials for the "purpose of providing information for the diagnosis, prevention, or treatment of any disease or impairment of, or the assessment of the health of, human beings." 42 U.S.C.S. § 263a(a) (Law.Coop.1988 & Supp. 1991). CRL contends that its collection containers and protocols are regulable under the "assessment of the health of" clause of section 263a(a).

The provisions of the FDCA and CLIA are not inconsistent. The "diagnosis, prevention, or treatment" language in section 263a parallels the "diagnosis ... or treatment, or ... prevention" language in the FDCA. *Compare* 42 U.S.C.S. § 263a(a) *with* 21 U.S.C.S. § 321(h)(2). In addition, CLIA regulations require laboratories subject to HCFA jurisdiction to comply with "all applicable Federal ... laws." 42 C.F.R. § 493.701 (1991). It appears, therefore, that Congress intended to leave some regulatory overlap between the FDCA and CLIA.

The court finds that CLIA does not preempt the FDA's authority to regulate facilities like CRL. When two statutes are " 'capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.' " *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1018, 104 S.Ct. 2862, 2881, 81 L.Ed.2d 815 (1984) (quoting *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 133–34, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974). The FDA has authority to regulate under the FDCA even if there is overlapping regulatory authority in another body. *See Bell v. Goddard*, 366 F.2d 177 (7th Cir.1966); *cf. Uselton v. Commercial Lovelace Motor Freight, Inc.*, 940 F.2d 564, 585 (10th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 589, 116 L.Ed.2d 614 (1991) (even if ERISA provisions duplicated investor protection afforded by the Federal Securities Acts, the later enacted ERISA did not displace the Securities Acts).

■ The court notes that the underlying argument made by CRL that the regulatory target of the FDA is really CRL's testing protocols, rather than the specimen collectors, and that these protocols are beyond the FDA's jurisdiction, is not yet ripe for adjudication. The purpose of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a real and concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); *accord Ash Creek Mining Co. v. Lujan*, 934 F.2d 240, 241 (10th Cir.1991). An issue is not ripe for adjudication when it is not clear what, if any, regulatory action the FDA will take, or what justification it will give for taking such action. *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 163, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967).

Although the court holds today that CRL's specimen collection containers are devices within the meaning of the FDCA, the FDA has not yet taken any action regarding the premarket approval of these devices. CRL's argument simply assumes that the FDA will deny its application for premarket approval, without giving the FDA an opportunity to make that decision. The FDA could grant such approval and allow CRL to continue its HIV–1 testing, making a judicial determination of the FDA's ability to regulate laboratory test procedures unnecessary. As the Supreme Court held in *Toilet Goods:*

> [W]e think it wiser to require them to exhaust this administrative process through which the factual basis of [the FDA's action] will certainly be aired and where more light may be thrown on the Commissioner's statutory and practical justifications.... Judicial review will then be available, and a court at that juncture will be in a better position to deal with the question of statutory authority.

*Id.* at 166, 87 S.Ct. at 1525.

The court emphasizes that its holding is a narrow one. Because the issue is not ripe, the court expresses no opinion on the FDA's authority to regulate CRL's testing protocols. The court holds only that the specimen collection containers used by CRL as a part of those protocols are medical devices within the meaning of the FDCA and are thus within the FDA's jurisdiction to regulate.

### 4. Classification of the Devices

■ Even though the collection containers are medical devices, they are subject to the FDCA's premarket approval requirement in this case only if they are categorized as Class III devices under 21 U.S.C. § 360c. CRL contends that these items should be categorized as Class I or II devices because they are not "new devices" and because the FDA has previously classified specimen collection containers in Class I or II.

New devices are automatically categorized as Class III devices, for which an approved application for premarket approval is required under 21 U.S.C. § 360e(a). A device is "new" if it has not been introduced into interstate commerce before May 28, 1976, unless (1) the device is of a type previously classified as Class I or II *and* the FDA has made a finding that the device is substantially equivalent to the previously classified device;[10] or (2) the FDA has issued an order reclassifying the new device into Class I or II. 21 U.S.C. § 360c(f)(1). The classification regulations for old devices (those introduced before May 28, 1976) do not apply to new devices, regardless of whether the new device appears similar to old devices that were categorized in Class I or II. 21 U.S.C. § 360c(b)(1); 21 C.F.R. § 860.84(a) (1991).[11]

It is uncontroverted that the FDA has made no reclassification or substantial equivalence order under section 360c(f)(1) with respect to the collection containers at issue here. It is therefore clear that if these items were introduced by CRL after May 28, 1976, they are automatically Class III devices subject to the premarket approval regulations.

Although generic specimen containers were introduced before 1976, the specific use to which CRL puts these items began when CRL introduced its HIV–1 urine and saliva testing protocols in 1989. At that time CRL relabeled[12] and repackaged generic specimen collection containers for use in its testing procedures by including its own instruction sheets and consent forms. (*See* CRL's Memorandum in Support of Summary Judgment, Statement of Fact

---

**10.** A finding of substantial equivalence requires an order by the Secretary that the items have the same technological characteristics or that the new item is safe and effective as a legally marketed device. 21 U.S.C.S. § 360c(i)(1)(A) (Law.Coop.Supp.1991).

**11.** CRL's argument that these specimen collection containers have previously been designated as Class I or II devices by the FDA is therefore inapposite.

**12.** "Labeling" is defined in the FDCA as "all labels and other written, printed, or graphic matters (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m).

No. 17, 18). Such relabeling and repackaging constituted creation of a new device for purposes of the FDCA. *See* 21 C.F.R. § 807.3(d) (1991) (manufacture of a device includes "[r]epackaging or otherwise changing the container, wrapper, or labeling of any device package in furtherance of the distribution of the device"). In addition, the new use (*i.e.*, HIV–1 testing) to which CRL put the specimen collectors makes these items new devices under the Act. *See, e.g., Hoffman v. Sterling Drug, Inc.*, 485 F.2d 132, 137 (3d Cir.1973) (new drug case; newness of drug "may arise by reason of a new or different recommended use"); 21 C.F.R. § 807.81(a) (1991) (premarket notification required for device whose intended use has changed); House Report, *supra*, at 14–15 (when a device may be used for more than one purpose "it is the Committee's intention that each use may, at the Secretary's discretion, be treated as constituting a different device for purposes of classification and other regulation."). Thus, the specimen collection containers used by CRL are "new devices" within the meaning of the FDCA and are automatically categorized as Class III devices, requiring premarket approval.

Finally, CRL claims that, even if the specimen collectors are Class III devices, they are exempt from premarket regulation. The court is unable to discern, however, a statutory or regulatory provision exempting these items from the premarket *approval* requirement. Although 21 C.F.R. § 807.65(c) and (i) provide exemptions for certain devices, they are merely exemptions from the premarket *registration* requirement. Moreover, these exemptions do not apply to CRL because the specimen collectors at issue are promoted for medical uses, contrary to the requirement in 21 C.F.R. § 807.65(c), and are not "previously manufactured" devices, as required by 21 C.F.R. § 807.65(i). In addition, the exemption from premarket *notification* given to "a repackager who places his own name on a device and does not change any other labeling or otherwise affect the device," provided by 21 C.F.R. § 807.85(b), is inapplicable because CRL changed the labeling and packaging of the specimen collectors at issue.

## IV. CONCLUSION

In summary, the court finds that the specimen collection containers used by CRL for its saliva and urine HIV–1 testing protocols are "devices" within the meaning of 21 U.S.C. § 321(h). The court further finds that these items are new devices, appropriately categorized in Class III, for which an application for premarket approval was required. Because CRL introduced these items into interstate commerce without having an approved application for premarket approval on file with the FDA, the devices were adulterated within the meaning of 21 U.S.C. § 351(f). The FDA therefore had the authority to institute the present seizure action. For these reasons, the court grants the FDA's cross-motion for summary judgment.

*It is therefore ordered by the court* that the FDA's motion to dismiss Civil Action No. 91–2313 (Doc. # 20) is granted. CRL's motions to consolidate (Doc. # 29) and for partial summary judgment (Doc. # 15) in 91–2313 are denied as moot.

*It is further ordered* that in Civil Action No. 91–2412 CRL's motion to consolidate (Doc. # 6) is denied as moot, CRL's motion to quash the seizure (Doc. # 10) is denied, and CRL's motion for summary judgment (Doc. # 8) is denied. The FDA's cross-motion for summary judgment is granted.

IT IS SO ORDERED.