**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**An UNDETERMINED NUMBER**
**OF UNLABELED CASES,**
**etc., Defendant,**

**Clinical Reference Laboratory,**
**Inc., Claimant–Appellant.**

No. 92–3458.

United States Court of Appeals,
Tenth Circuit.

April 15, 1994.

---

1. *See United States v. Miller,* 811 F.Supp. 1485    (D.N.M.1993).

Donald E. Segal (John C. Monica and Laura D. Stith, Shook, Hardy & Bacon, Kansas City, MO and Timothy M. O'Brien, Shook, Hardy & Bacon, Overland Park, KS, with him on the briefs), Akin, Gump, Strauss, Hauer & Feld, Washington, DC, for claimant-appellant.

Steven A. Keller (Stuart E. Schiffer, Acting Asst. Atty. Gen., U.S. Dept. of Justice, Washington, DC and Margaret Jane Porter, Chief Counsel, Christopher McHenry and Diane Maloney, Asst. Chief Counsel for Enforcement, U.S. Food & Drug Admin., Rockville, MD, with him on the briefs), Trial Atty., Office of Consumer Litigation, U.S. Dept. of Justice, Washington, DC, for plaintiff-appellee.

Before MOORE, Circuit Judge, McWILLIAMS, Senior Circuit Judge, and COOK, Senior District Judge.*

JOHN P. MOORE, Circuit Judge.

Clinical Reference Laboratory, Inc. appeals a grant of summary judgment holding certain urine and saliva specimen containers used in HIV-testing are adulterated "devices" subject to seizure pursuant to the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301–394. CRL contends the containers do not constitute devices within the meaning of 21 U.S.C. § 321(h) because CRL performs the tests for insurance risk assessment purposes and not for medical diagnosis. Also, CRL contests their designation as class III devices subject to premarket approval by the Food and Drug Administration. We affirm the district court's holding the containers are "devices." However, because we conclude the containers are not class III devices, we hold they are not adulterated due to CRL's failure to seek premarket approval.

CRL employs a series of laboratory protocols to help life insurance companies screen applicants for various health risks. One of these protocols detects HIV–1 antibodies in saliva and urine specimens. Formerly, to obtain the necessary samples, CRL purchased specimen containers, repackaged them into kits which included instruction sheets, and forwarded them along with consent forms to insurers to collect specimens. CRL reported its HIV findings to the insurance companies as either "non-reactive" for normal results or "inconclusive" for any other result.

The FDA maintains AIDS tests which do not use blood products or serum violate the Act. Furthermore, specimen containers used in these disapproved tests must receive premarket approval by the FDA. Accordingly, the FDA told CRL to cease distribution of the containers used in detecting HIV antibodies or face enforcement action. In response, CRL filed an action requesting declaratory and injunctive relief on the grounds the FDA lacked authority to regulate the containers. The FDA countered with its own action seeking to seize and condemn the containers. According to the FDA, the containers were adulterated as defined in 21 U.S.C. § 351(f)(1)(B) because they were class III devices which had not received premarket approval.

The district court consolidated the actions and ultimately granted summary judgment for the government on the issue of whether it

---

* Honorable H. Dale Cook, Senior Judge for the United States District Court for the District of Oklahoma, sitting by designation.

had authority to pursue the seizure action. 791 F.Supp. 1499. The court determined the containers satisfied the statutory definition of device, 21 U.S.C. § 321(h), because they were used to diagnose disease. In addition, the court found the containers constituted new devices categorized into class III under 21 U.S.C. § 360c because CRL repackaged and relabeled the containers. The court ruled CRL's failure to seek premarket approval as required for class III devices caused the containers to be adulterated pursuant to 21 U.S.C. § 351(f) and subject to seizure by the FDA. In a subsequent summary judgment motion, the court declared the containers adulterated and ordered them condemned and destroyed.

■■■ This court reviews *de novo* a grant of summary judgment. *Mock v. T.G. & Y. Stores Co.*, 971 F.2d 522, 528 (10th Cir.1992). Summary judgment is appropriate where no genuine issue of material fact exists and judgment turns on a matter of law. *Id.* Here, the parties dispute the law and not the facts. The focus of this court's inquiry is whether the Act empowered the FDA to take the actions it did and not the efficacy of those actions. *See United States v. An Article of Drug ... Bacto–Unidisk*, 394 U.S. 784, 791– 92, 89 S.Ct. 1410, 1414–15, 22 L.Ed.2d 726 (1969) (considering whether definition of "drug" in the Act permitted challenged FDA regulations rather than wisdom of those regulations). We must liberally construe the Act consistent with its overriding purpose to protect the public health. *Id.* at 798, 89 S.Ct. at 1418.

## I.

CRL contends the specimen containers do not qualify as devices regulated by the Act because CRL neither used them nor intended to use them for medical diagnosis as the containers were not part of a prelude to medical treatment. Essentially, CRL argues the containers' use for insurance risk assessment and CRL's subsequent actions removed the containers from the statute's reach. CRL maintains it did not provide a firm answer about the presence of HIV and reported findings only to the insurer. Moreover, CRL expressly informed applicants the test did not furnish a medical diagnosis. All of these actions, CRL claims, are inconsistent with the meaning of "diagnosis."

■■■ The Act includes in its definition of "device" an article "intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease." 21 U.S.C. § 321(h)(2). To qualify as a device under the statute, an article must serve either a diagnostic or therapeutic purpose. The definition does not define the term "diagnosis" nor limit diagnostic devices to those used prior to medical treatment. In comparison, the regulatory definition of "in vitro diagnostic products," articles "intended for use in the collection, preparation, and examination of specimens taken from the human body," explicitly ties diagnosis with later medical treatment. *See* 21 C.F.R. § 809.3(a) (in vitro diagnostic products "intended for use in the diagnosis of disease or other conditions, including a determination of the state of health, in order to cure, mitigate, treat, or prevent disease or its sequelae"). However, this regulation does not narrow the broad language of the Act. The plain meaning of "diagnosis" disregards context and bears no connection to medical treatment. A diagnosis is "the art or act of identifying a disease from its signs and symptoms" or alternatively an "investigation or analysis of the cause or nature of a condition, situation, or problem." *Webster's Third New International Dictionary* 622 (1981). Therefore, the Act regulates as a "device" an article intended for use in diagnosis regardless of whether medical treatment will follow.

CRL used the specimen containers as part of a protocol which seeks to identify the presence of HIV antibodies. The fact CRL's results were inconclusive does not eliminate the diagnostic nature of CRL's inquiry. *See United States v. 25 Cases, More or Less, of an Article of Device*, 942 F.2d 1179, 1181–83 (7th Cir.1991) (term "diagnosis" in 21 U.S.C. § 321(h)(2) brings within definition of "device" an article which screens for possible symptoms of disease but does not provide final identification of condition). Also, the fact insurance companies rather than health professionals considered CRL's findings to make business rather than *medical decisions*

does not erase the diagnostic character of CRL's activities or the containers' use. Therefore, we conclude the specimen containers at issue are devices within the meaning of 21 U.S.C. § 321(h)(2) and subject to FDA regulation.

## II.

■ The amount of regulation governing a device depends upon its classification. The Act divides devices into three classes of which only class III must earn premarket approval. 21 U.S.C. § 360c(a)(1). A device not introduced into interstate commerce for commercial distribution prior to May 28, 1976, is initially a class III device unless it is substantially equivalent to a device of the same type commercially distributed before May 28, 1976, or distributed after that date and classified as class I or II. 21 U.S.C. § 360c(f)(1).

As a starting point, we note a "specimen transport and storage container," defined as a device intended to store and transport a biological specimen for later destruction or use in a diagnostic examination, is designated as class I. 21 C.F.R. § 864.3250. The regulations place into class I a related item, a "microbiological specimen collection and transport device," used to aid in the diagnosis of disease caused by pathogenic microorganisms and defined as "a specimen collecting chamber intended for medical purposes to preserve the viability or integrity of microorganisms in specimens during storage of specimens after their collection and during their transport from the collecting area to the laboratory." 21 C.F.R. § 866.2900. An amniotic fluid sampler, which includes specimen containers as components, is a class II device. 21 C.F.R. § 884.1550.

The FDA can reclassify a device already in distribution as class III for purposes of a new intended use. See, e.g., 21 C.F.R. § 864.3(b). The FDA has made no sugges-

tion the specimen containers supplied by their manufacturers to CRL are "new" class III devices subject to premarket approval. Rather the agency contends CRL has put the containers to a new intended use, collecting urine and saliva for HIV testing, which reassigns them to class III status.

Common sense suggests the function of generic urine and saliva specimen containers does not vary with the protocols later executed upon the samples they hold. The purpose of the device classifications further demonstrates the fallacy in the FDA's argument. The classifications provide for the minimum amount of regulation to ensure the safety and effectiveness of devices governed by the Act. See 21 U.S.C. § 360c(a)(1) (class I subjects devices to general controls, class II to special controls, class III to premarket approval). The safety and effectiveness of a specimen container for its intended use turns on its ability to hold and preserve the integrity of a specimen. By contending a new testing protocol performed on a specimen creates a new intended use for the container which carries it, the FDA essentially suggests the protocol implicitly raises concerns about the safety and effectiveness of the container. However, the safety and effectiveness of a container cannot be compromised where it is not employed in a new way. Even though CRL instituted a new testing protocol, the laboratory did not use or intend to use the containers at issue in a new manner. Therefore, the containers are not class III devices subject to premarket approval.[1]

**AFFIRMED** in part and **REVERSED** in part.

COOK, Senior District Judge, concurring in part and dissenting in part:

The statute in question 21 U.S.C. § 321(h)[1] provides that a device must be *intended for use* in the diagnosis of disease or in the cure, mitigation, treatment, or pre-

---

1. Having reached these conclusions, we need not address whether the FDA has authority under the Act to regulate the HIV-testing protocol on saliva and urine samples nor whether the Clinical Laboratories Improvement Act, 42 U.S.C. § 263a, supersedes the Act in this regard.

1. A "device" is defined as "... an instrument, apparatus ... in vitro reagent, or other similar or related article, ... which is ... intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals ..."

vention of disease. The government concedes that it does not claim that a device which has no medical application could "qualify as a device under the FDCA." Appellee Brief, p. 16. There is no evidence present in the record that the containers involved here had any medical application.[2] They were used only to "transport the specimens to the lab for analysis". Appellee Brief, p. 12. Again, the government characterizes them as "generic collection containers". Appellee Brief, p. 5. They were used, along with other materials, merely to contain and transport the specimens from one location to another, where, upon arriving at their destination, a totally independent and separate testing protocol was applied. It is the testing protocol which is the diagnosis. Under the facts of this case, the containers played no part in the protocol of diagnosis. If an item's participation in the mere transportation and containment of a specimen means that the item constitutes a "device" under the statute and regulations, then it could be argued that all means of transportation and containment so used would also qualify as a "device". If the containers were required to be of special design as part of the protocol, a stronger argument could be made that they serve a use in diagnosis. From the evidence before us, these containers were perfectly ordinary. The conclusion that these ordinary containers were "used" in diagnosis can only be reached in the most attenuated sense, in the same way that a truck or airplane might be "used" in the transportation and/or containment process. The majority quite rightly says that the act must be liberally construed consistent with its overriding purpose to protect the public health. However, the majority's reading goes beyond liberality to all-inclusiveness. For the above reasons, I respectfully dissent from Part I.

---

2. 21 C.F.R. § 864.3250 generally describes specimen storage and transport containers as Class 1 devices. However, the statute contains the additional definitional requirement of use in diagnosis.